**GLANCY PRONGAY & MURRAY**
Lionel Z. Glancy
Robert V. Prongay
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (301) 201-9150
Fax: (301) 201-9160
Email: lglancy@glancylaw.com
        rprongay@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lesley Frank Portnoy
230 Park Avenue
Suite 530
New York, NY 10169
212-682-5340
Fax: 212-884-0988
Email: lportnoy@glancylaw.com

*Counsel for Lead Plaintiff*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZHONG ZHENG, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>PINGTAN MARINE ENTERPRISE LTD., XINRONG ZHUO, and ROY YU,<br><br>    Defendants. | Case No.: 1:17-cv-03807-DLI-ST<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Lynda Huang ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon,

1

*inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Pingtan Marine Enterprise Ltd. ("Pingtan" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the common stock of Pingtan from March 9, 2016 through May 10, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Pingtan is a China-based, U.S.-listed company that purports to engage in the ocean fishing.  Pingtan generates revenue by selling seafood products in the People's Republic of China ("PRC").

3.      In 2013, Pingtan became a publicly-listed company in the U.S. via a process known as a "reverse merger."  Reverse mergers allow companies to enter the American capital markets while bypassing the typical regulatory scrutiny and sell-side due diligence that usually precede an initial public offering.

4.      According to Pingtan's annual reports filed with SEC on Form 10-K, Pingtan's revenue depended heavily on its catches from Indonesian waters, specifically the Arafura Sea in Indonesia.

5.      Throughout the Class Period, Pingtan's SEC filings falsely stated that a majority of Pingtan's fishing vessels are licensed by the Indonesian government to fish in Indonesian waters.

6.      In actuality, Pingtan never had any licenses to fish in Indonesian waters.

7.      Pingtan also falsely claimed to possess licenses to fish in the waters of Timor-Leste.  In a press release dated August 4, 2016, and in subsequent Forms 10-K and Forms 10-Q filed with the SEC, Pingtan falsely announced that the government of Timor-Leste had awarded fishing licenses to 13 Pingtan fishing vessels, allowing these Pingtan vessels to fish in the waters of Timor-Leste.

8.      In actuality, the Timorese fishing licenses were not issued to Pingtan's vessels; rather, they were issued to vessels owned by a company called Fuzhou Hong Long Ocean Fishery Co., Ltd. ("Hong Long").  Hong Long is not part of Pingtan; it is a separate company owned and controlled by the wife of Pingtan's CEO, Defendant Xinrong Zhuo.

9.      Pingtan's web of lies was exposed on May 10, 2018, when the investment research firm Aurelius Value published a report titled "Pingtan Marine: A Fraud that Finances Human Trafficking and Poaching" (the "Aurelius Report").  The Aurelius Report revealed to investors that Pingtan never had any licenses to fish in Indonesian waters, and that 13 Timorese licenses were actually awarded to Hong Long's vessels rather than Pingtan's.

10.     The Aurelius Report shocked the market.  The value of Pingtan's common stock fell by $1.16 per share, or over 28% from its previous closing price, to close at $2.95 per share on May 10, 2017, damaging Plaintiff and other Pingtan investors.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

13.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of Defendants' actions, and subsequent damages, took place within this judicial district.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff, as set forth in her PSLRA Certification previously filed with the Court, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

16.     Defendant Pingtan engages in the ocean fishing business. Pingtan is incorporated in the Cayman Islands and its principal executive offices are located at 18-19/F, Zhongshan Building A, No. 154 Hudong Road, Fuzhou, China 350001. During the Class Period, the

Company's common stock was traded on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "PME."

17.     Defendant Xinrong Zhuo ("Zhuo") is and was Pingtan's Founder, Chief Executive Officer ("CEO") and Chairman of the Board of Directors at all relevant times during the Class Period.

18.     Defendant Roy Yu ("Yu") is and was Pingtan's Chief Financial Officer ("CFO") at all relevant times during the Class Period.

19.     Defendants Zhuo and Yu are sometimes referred to herein as the "Individual Defendants."

20.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

21.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

22.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

23.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

*Company Background*

24.     Pingtan is a China-based marine company that purports to engage in ocean fishing.  In 2013, Pingtan became listed on NASDAQ via a mechanism known as a "reverse merger."   In a typical reverse merger, a publicly-traded shell company acquires a private company seeking to go public.  In exchange, the shareholders of the former private company receive a controlling share of the public company.  Reverse mergers allow companies to enter the American capital markets while bypassing the typical regulatory scrutiny and sell-side due diligence that usually precede an initial public offering.

25.     Headquartered in China's Fujian Province, Pingtan's fleet of vessels purports to operate and fish in Indonesian, Indian, Timorese, as well as in International waters in the Atlantic and Pacific Oceans.

26.     Pingtan's revenue comes primarily from selling the seafood products that it catches to customers in the PRC, including restaurants, distributors, and exporters.

*Illegal Fishing by Foreign Vessels in Indonesian Waters*

27.     In response to widespread illegal fishing by foreign vessels in Indonesian waters, the Indonesian government in December 2014 implemented a moratorium (the "Moratorium") on issuing new fishing licenses and renewing existing fishing licenses, so that the government could focus on monitoring the operations of existing fishing vessels in Indonesian waters.

28.     According to the *New York Times'* December 18, 2014 article titled "Indonesia Takes Tough Stance in Fighting Illegal Fishing", the Moratorium was part of the Indonesian government's effort to "take a hard line" against the thousands of foreign vessels that were operating illegally in Indonesian water, without valid licenses issued by the Indonesian government.  During the period of the Moratorium, the Indonesian navy ramped up its enforcement action against foreign fishing vessels operating without a license in Indonesian waters, hunting down and seizing numerous illegal foreign fishing vessels.  According to Susi Pudjiastuti, Indonesia's Minister of Maritime Affairs and Fisheries, approximately 7,000 foreign vessels were operating illegally in Indonesian waters (i.e. without an Indonesian fishing license).

29.     The Moratorium ended in November 2015.

## Materially False and Misleading Statements

*Pingtan Falsely Claims to be Licensed to Fish in Indonesian Waters*

30.     On March 9, 2016, Pingtan filed its 2015 annual report on Form 10-K with the SEC ("2015 10-K").  The 2015 10-K was signed by Defendants Zhuo and Yu.

31.     The 2015 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), certifying that the 2015 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report."

32.     In the 2015 10-K, Pingtan stated that "Among [Pingtan's] 135 fishing vessels, ***117 of these vessels are licensed to operate in the Arafura Sea in Indonesia*** but temporarily not operating due to [the Moratorium]". (Emphasis added).

33.     Indeed, the 2015 10-K also stated unequivocally: "We currently operate 135 fishing vessels and ***have a license to operate 117 of these vessels operate (sic) in the Arafura Sea of Indonesia***."  (Emphasis added).

34.     On May 10, 2016, Pingtan filed its quarterly report for the first quarter of 2016 on Form 10-Q with the SEC ("2016 Q1 10-Q").  The 2016 Q1 10-Q was signed by Defendants Zhuo and Yu.

35.     The 2016 Q1 10-Q also contained signed certifications pursuant to SOX, certifying that the 2016 Q1 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

36.     The 2016 Q1 10-Q stated that "Among [Pingtan's] 135 fishing vessels, ***117 of these vessels are licensed to operate in the Arafura Sea in Indonesia*** but temporarily not operating due to the [Moratorium]". (Emphasis added).

37.     On May 8, 2016, Pingtan filed its quarterly report for the second quarter of 2016 on Form 10-Q with the SEC ("2016 Q2 10-Q").  The 2016 Q2 10-Q was signed by Defendants Zhuo and Yu.

38.     The 2016 Q2 10-Q also contained signed certifications pursuant to SOX, certifying that the 2016 Q2 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

39.     The 2016 Q2 10-Q stated the following with regards to Pingtan's fishing operations in Indonesia: "As of June 30, 2016, we own 107 trawlers, 4 longline fishing vessels, 2 squid jigging vessels and 2 drifters and have exclusive operating license rights to 20 drifters*…These vessels are fully licensed to fish in Indonesian*, Indian, or Western and Central Pacific Ocean of the international waters." (Emphasis added).

40.     On November 18, 2016, the Company filed a Form 10-Q for the second quarter of 2016 (the "2016 Q3 10-Q") with the SEC.  The 2016 Q3 10-Q was signed by Defendants Zhuo and Yu.

41.     The 2016 Q3 10-Q also contained signed certifications pursuant to SOX, certifying that the 2016 Q3 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

42.     The 2016 Q3 10-Q stated the following with regards to Pingtan's fishing operations in Indonesia: "As of September 30, 2016, we own 107 trawlers, 4 longline fishing vessels, 2 squid jigging vessels and 2 drifters and have exclusive operating license rights to 20 drifters*…These vessels are fully licensed to fish in Indonesian*, Indian, or Western and Central Pacific Ocean of the international waters." (Emphasis added).

43.     On March 23, 2017, Pingtan filed its 2016 annual report on Form 10-K with the SEC ("2016 10-K").  The 2016 10-K was signed by Defendants Zhuo and Yu.

44.     2016 10-K also contained signed certifications pursuant to SOX, certifying that the 2016 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report."

45.     The 2016 10-K stated the following with regards to its fishing operations in Indonesia: "*Among [Pingtan's] 135 fishing vessels*, 13 are operating in Indo-Pacific waters; 12 are operating in the Bay of Bengal in India; 2 are operating in international waters of Southwest Atlantic and Southeast Pacific Oceans; 4 will be operating in international waters of Pacific Ocean upon completion of paperwork formalities, and *the remaining vessels are licensed to operate in the Arafura Sea in Indonesia but temporarily not operating due to the moratorium discussed below*. (Emphasis added).

46.     The 2016 10-K also stated unequivocally: "We currently operate 135 fishing vessels and *have a license to operate 104 of these vessels operate (sic) in the Arafura Sea of Indonesia*." (Emphasis added).

47.     The statements referenced in ¶¶ 31-46 above are false and misleading because, as explained more fully below, Pingtan's vessels were never licensed to fish in Indonesian waters.

*Pingtan Falsely Claims to Have Obtained Licenses to Fish in the Waters of Timor-Leste*

48.     In addition to making misrepresentations about being licensed to fish in Indonesian waters, Pingtan also misrepresented that it had obtained fishing licenses from the government of Timor-Leste to fish in Timorese waters.

49.     On August 4, 2016, Pingtan issued a press release titled "Pingtan Marine Enterprise Obtains Access to Fishing Licenses From Timor-Leste."  In this press release, Pingtan announces that thirteen of its vessels have obtained fishing licenses from the Ministry of Agriculture and Fisheries of Timor-Leste, allowing them to operate in the sea areas of Timor-Leste.

50.     Pingtan repeated this claim in the 2016 Q2 10-Q and the 2016 Q3 10-Q, stating: "Among [Pingtan's] 135 fishing vessels, 13 vessels have obtained fishing licenses from the Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste and will operate in the sea area of Democratic Republic of Timor-Leste[.]"

51.     Pingtan's statements in ¶¶49-50 are false and misleading because, as explain more fully below, the Timorese fishing licenses were not issued to Pingtan.  Rather, they were issued to Hong Long, a different company that is owned and controlled by Defendant Zhuo's wife.

### Pingtan's Lies Exposed

52.     On May 10, 2017, the investment research firm Aurelius Value published a report on Pingtan.  The Aurelius Report revealed to investors that: (1) Pingtan's vessels were never licensed to fish in Indonesian waters; and (2) the Timorese fishing licenses were issued to Hong Long, not Pingtan.

53.     Concerning Pingtan's false representation that 117 of its vessels had licenses to fish in Indonesian waters, the Aurelius Report references several Indonesian news articles in which Susi Pudjiastuti, Indonesia's Minister of Marine Affairs and Fisheries, denied that Pingtan ever had licenses to fish in Indonesia, and going as far as to say that she would report Pingtan to NASDAQ for falsely claiming that it had Indonesian fishing licenses.

54.     For example, the Aurelius Report points to an article that appeared on KKP News, an Indonesian news publication, dated August 27, 2015, in which Minister Pudjiastuti said she would report Pingtan to NASDAQ for falsely reporting that their vessels operated in the Arafura Sea of Indonesia.  According to Minister Pudjiastuti, the Indonesian government has no record of a company called Pingtan.  Plaintiff has confirmed and accessed this August 27, 2015 KKP News article.

55.     Separately, on September 17, 2015, an article titled "Minister Susi to Take Chinese Corporation to Court" appeared in the *Jakarta Post*.  The article states that Indonesia's fishing regulator plans to sue Pingtan for fishing illegally in Indonesian waters.

56.     Concerning Pingtan's claim that it obtained fishing licenses from the government of Timor-Leste to fish in Timorese waters, the Aurelius Report revealed that those licenses were actually issued to Hong Long, not Pingtan.

57.     According to Pingtan's 2015 and 2016 10-K, Hong Long is a company that is majority owned and controlled by Defendant Zhuo's wife.

58.     The Aurelius Report references a November 20, 2016 news release posted on the website of the Chinese Embassy in Timor-Leste.  This news release expressly states that the Timorese government granted fishing licenses to Hong Long's vessels; Pingtan is not mentioned in this release.  Plaintiff has confirmed and accessed this new release on the Chinese Embassy's website.

59.     To the extent Pingtan may argue that while Hong Long is the owner of those 13 vessels with the Timorese fishing license, the vessels are nevertheless under Pingtan's control because Pingtan purchased the operating rights to those particular vessels (and there is no

indication that this occurred), such an argument is spurious because Pingtan assured the Timorese government that it had nothing to do with those vessels.

60.    Indeed, the Aurelius Report references a February 25, 2017 *Sydney Morning Herald* article titled "Economy of Scales: Depleted Stock Force Asian Fisherman into Australian Waters."  According to this article, Acacio Guterres, the Director of Fisheries in Timor-Leste, confirmed that the licenses were issued to Hong Long.  Moreover, Director Guterres "***had sought and received a written assurance Pingtan was not involved after the company last year issued a press release to investors boasting of new fishing rights in Timorese waters***." (Emphasis added).  Plaintiff has confirmed and access this February 25, 2017 *Sydney Morning Herald* article.

61.    The Aurelius Report shocked the market, as the value of Pingtan's common stock fell $1.16 per share or over 28% from its previous closing price to close at $2.95 per share on May 10, 2017, damaging investors.

62.    It is not a surprise that the market reacted so strongly to the news that Pingtan never had licenses to fish in Indonesia and that its illegal fishing activities had drawn the attention of Indonesian regulators, as Pingtan's revenue is heavily dependent on its fishing activities in Indonesian waters.  *See, e.g.* 2015 10-K and 2016 10-K ("we derive a majority of our revenue from [Indonesian waters]…").

63.    Notably after the publication of the Aurelius Report, in a May 11, 2017 press release Defendants emphasized the materiality of maintaining proper licenses to Pingtan's operations: "The Company considers the value of its fleet relatively similar to the taxi medallion market where the value of the limited license is greater than the physical cost of the means of transportation."

13

64.     Defendants' subsequent corporate filings also maintained the fiction that its vessels were properly licensed in Indonesia.  For instance, in their May 15, 2017 10-Q filing, Defendants stated that 104 of its vessels "are licensed to operate in the Arafura Sea in Indonesia. . ."  In the same filing, Defendants stated "We currently operate 140 vessels and have a license to operate 104 of those vessels in the Arafura Sea of Indonesia. . . . Each of our fishing vessels operating in Indonesian waters requires a fishing license granted by the authority in Indonesia."

65.     On March 14, 2018, Defendants acknowledged, albeit obliquely, in their 2017 10K filing that "[t]he vessels in Indonesian waters . . . are not in operation because the licenses are currently inactive due to either the moratorium discussed below, *the revocation of the fishery business license of the local entity through which the vessels operate, or, with respect to four vessels, the revocation of the local fishing licenses.*" (Emphasis added.)   Defendants also disclosed "During the moratorium, we were informed that fishing licenses of four vessels operated through PT. Avona, one of the local companies through which we conduct business in Indonesia, and the fishery business license of PT. Dwikarya, the other local company through which PME conducts business in Indonesia, were revoked. As a result and because license renewal was prohibited due to the general moratorium, all local fishing licenses of the Company's vessels in Indonesia are presently inactive."   Defendants further stated "the Company's vessels located in Indonesia currently do not have active local fishing licenses as they were either revoked or have lapsed, since the moratorium prevented renewing of fishing license."

## ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

66.     Defendant Zhuo, Pingtan's CEO, Founder, and Chairman of the Board of Directors, is intimately involved in all aspects of Pingtan's operations.  Pingtan's 2015 10-K and

2016 10-K state "We depend significantly on our Chief Executive Officer", and "Mr. Zhuo, given his extensive knowledge of China's fishing industry, coupled with the fact that *he has overseen our operations since inception*, is the director most familiar with our business and industry, and is best positioned to set and execute strategic priorities." (Emphasis added).

67.     Defendant Roy Yu, Pingtan CFO, has been at the helm of other fraudulent Chinese companies listed in the U.S. For example, Yu was the CFO of Lihua International, Inc. from October 2008 to November 2012.  Lihua was sued by investors in May 2014 for fraud that occurred for a period of time that include when Yu was at Lihua.  Lihua ultimately settled the case for $2.865 million.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publically traded securities of Pingtan during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

69.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

70.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

71.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

72.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the Company's business and operations;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

73.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

74.      Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      the omissions and misrepresentations were material;

(c)      the Company's securities are traded in efficient markets;

(d)      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)      the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

75.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

76.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

79.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue

statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

81.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

82.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

83.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the

Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

84.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

85.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

86.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

87.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

89.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

90.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

91.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

92.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 29, 2018                          Respectfully submitted,

                                             **GLANCY PRONGAY & MURRAY LLP**

                                             By:  *s/ Robert V. Prongay*
                                             Robert V. Prongay
                                             Lionel Z. Glancy
                                             1925 Century Park East
                                             Suite 2100
                                             Los Angeles, CA 90067
                                             Telephone: (301) 201-9150
                                             Fax: (301) 201-9160
                                             Email: lglancy@glancylaw.com
                                                       rprongay@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lesley Frank Portnoy
230 Park Avenue
Suite 530
New York, NY 10169
212-682-5340
Fax: 212-884-0988
Email: lportnoy@glancylaw.com

*Counsel for Lead Plaintiff*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On May 29, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Eastern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 29, 2018.


*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 1:17-cv-03807-DLI-ST Zheng v. Pingtan Marine Enterprise Ltd. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Phillip Kim**
  pkim@rosenlegal.com

- **Lesley Frank Portnoy**
  lportnoy@glancylaw.com

- **Robert Prongay**
  rprongay@glancylaw.com,info@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)