UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZHONG ZHENG, Individually and on behalf of all others similarly situated, | Civil Action No. 17-cv-3807(DLI)(ST) |
| Plaintiff, | ECF Case |
| -against- | **ORAL ARGUMENT REQUESTED** |
| PINGTAN MARINE ENTERPRISE LTD., XINRONG ZHUO, and ROY YU, | Served July 30, 2018 |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PINGTAN MARINE ENTERPRISE LTD.'S MOTION TO DISMISS THE AMENDED COMPLAINT

MANATT, PHELPS & PHILLIPS, LLP
Ronald G. Blum
Yuri Mikulka (*Pro Hac Vice* pending)
Samantha J. Katze
7 Times Square
New York, NY  10036
Tel.:  (212) 790-4500
Fax:  (212) 790-4545
rblum@manatt.com
skatze@manatt.com
ymikulka@manatt.com
Attorneys for Defendant
Pingtan Marine Enterprise Ltd.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 3

    The Parties .................................................................................................. 3

    The Allegations of the Amended Complaint ............................................... 3

    Plaintiff's Allegations Regarding Scienter ................................................. 6

    Pingtan's Public Disclosures Regarding Its Fishing Operations In Indonesia ................ 6

    Pingtan's Public Disclosures Regarding Its Fishing Operations In Timor-Leste ............ 8

    The Purported "Corrective Disclosure" in the Aurelius Article ................... 10

ARGUMENT ......................................................................................................... 11

I.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION BECAUSE THE AURELIUS ARTICLE IS BASED ON PUBLIC INFORMATION ........................... 12

II.   PLAINTIFF FAILS TO ADEQUATELY PLEAD A MATERIAL MISREPRESENTATION OR OMISSION ......................................................... 15

    A.    Plaintiff Has Not Pled A Material Misrepresentation Or Omission Regarding Indonesian Fishing Licenses ............................... 15

    B.    Plaintiff Has Not Alleged Any Material Misrepresentations or Omissions Regarding The Timor-Leste Licenses ................................ 18

III.  PLAINTIFF FAILS TO PLEAD SCIENTER SUFFICIENTLY ..................... 21

    A.    Plaintiff Has Not Pled Facts Sufficient To Allege Individual Scienter That Can Be Imputed To Pingtan ............................ 22

    B.    Plaintiff Has Not Alleged Statements So "Dramatic" As To Infer Scienter ........ 24

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

Page

## CASES

*Adam Plotch LLC v. World Savings Bank, FSB*,
  15-CV-06142 (FB)(RER), 2018 WL 327247 (E.D.N.Y. Jan. 8, 2018)...................................16

*Altayyar v. Etsy, Inc.*,
  242 F. Supp. 3d 161 (E.D.N.Y. 2017) .......................................................................11, 22, 23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................................11

*Central States, Southeast & Southwest Areas Pension Fund v. Fed. Home Loan
  Mortgage Corp.*,
  543 Fed. Appx. 72 (2d Cir. 2013) .............................................................................12, 13, 15

*Cox v. Blackberry Ltd.*,
  660 Fed. Appx. 23 (2016).................................................................................................23

*ECA, Local 134 IBEW Joint Pension Trust*,
  553 F.3d 187 (2d Cir. 2009)..............................................................................................12

*Fila v. Pingtan Marine Enter. Ltd.*,
  15 Civ. 00267(AJN), 195 F. Supp. 3d 489 (S.D.N.Y. 2016).......................................... passim

*IBEW Local Union No. 58 Pension Fund & Annuity Fund v. Royal Bank of
  Scotland Group, PLC*,
  783 F.3d 383 (2d Cir. 2015)..........................................................................................11, 12

*In re Apple REITs Litig.*,
  11-CV-2919 (KAM), 2013 WL 1386202 (E.D.N.Y. Apr. 3, 2013), *vacated in
  part on other grounds*, 563 Fed. Appx. 81 (2d Cir. 2014).....................................................18

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008)..................................................................................23

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................................................ passim

*In re Omnicom Group, Inc. Sec. Litig.*,
  597 F.3d 501 (2d. Cir. 2010)........................................................................................13, 15

*Janbay v. Canadian Solar, Inc.*,
  10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012)....................................14

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006)..........................................................................................21, 22

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ............................................................................................22

## TABLE OF AUTHORITIES
### (continued)

Page

*Orlan v. Spongetech Delivery Sys., Inc.*,
    10-CV-4093 (DLI) (RML), 10-CV-4104 (DLI) (RML), 2017 WL 1131900
    (E.D.N.Y. Mar. 24, 2017) .................................................................................23

*Orlan v. Spongetech Delivery Sys., Inc., Sec. Litig.*,
    10-CV-4093 (DLI) (JMA), 10-CV-4104 (DLI)(JMA), 2012 WL 1067975
    (E.D.N.Y. Mar. 29, 2012) ....................................................................11, 12, 20

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).........................................................................17, 18

*Sfiraiala v. Deutsche Bank Aktiengesellschaft*,
    729 Fed. Appx. 55 (2d Cir. 2018) (Summary Order) ...........................................22

*Stinnett v. Delta Airlines, Inc.*,
    278 F. Supp. 3d 599 (E.D.N.Y. 2017) ...................................................................11

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)..............................................................................................11

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)............................................................................21, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................................21

### STATUTES

15 U.S.C. § 78j(b) / Section 10(b) ...........................................................................1, 12

15 U.S.C. § 78u-4(b) / PSLRA ........................................................................................1

### RULES

17 C.F.R. § 240.10b-5 (1964) / Rule 10b-5 ..............................................................1, 11

Fed. R. Civ. P. 9(b) ...............................................................................................1, 11, 19

Fed. R. Civ. P. 12(b)(6)....................................................................................1, 11, 12

Defendant Pingtan Marine Enterprise Ltd. ("Pingtan") respectfully submits this memorandum of law in support of its motion to dismiss with prejudice the amended complaint as against Pingtan, pursuant to Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) ("PSLRA").

## PRELIMINARY STATEMENT

This proposed securities class action is based on a May 10, 2017 article published on a website www.aureliusvalue.com (the "Aurelius Article"), which purportedly caused a 28% drop in Pingtan's stock price. But, the Aurelius Article is based on previously published news articles and Pingtan's own public filings, and other public information. It did not disclose new facts to the market. Thus, the purported "corrective disclosure" Plaintiff claims to allege is no more than third-party commentary regarding previously disclosed information.

In addition, the Aurelius Article did not expose -- and Plaintiff does not sufficiently allege -- any material misstatement or omission. Pingtan's public filings make clear that the purported misstatements or omissions were not material because they would not have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

In this regard, this case is like one against Pingtan brought by the same law firm that filed the original complaint in this action. *Fila v. Pingtan Marine Enter. Ltd.*, 15 Civ. 00267(AJN), Dkt. No. 38, 195 F. Supp. 3d 489 (S.D.N.Y. 2016) ("*Pingtan I*"). Judge Nathan in the Southern District of New York dismissed that case because the plaintiff failed to plead loss causation or a material misrepresentation or omission.

Here too, Plaintiff fails to state a securities fraud claim against Pingtan for alleged violations of Section 10(b) and Rule 10b-5 for three reasons.

<u>First</u>, as in *Pingtan I*, Plaintiff fails to allege a corrective disclosure and, accordingly, loss causation.  Under well-established law, a plaintiff cannot plead a corrective disclosure that is based on public information because public information is already incorporated into a company's stock price.  Thus, in *Pingtan I*, Judge Nathan held that where the alleged corrective disclosure was an article based on public information, plaintiff failed to state a Section 10(b) claim against Pingtan because Pingtan had not pled loss causation.  Just as in *Pingtan I*, the Aurelius Article here was only a "'negative journalistic characterization of previously disclosed facts'" which "'does not constitute a corrective disclosure of anything but the journalists' opinions.'"  *See Pingtan I*, 195 F. Supp. 3d at 497.

<u>Second</u>, also as in *Pingtan I*, Plaintiff does not allege a material misstatement or omission.  Whether Pingtan or its vessels ever had licenses to fish in Indonesia is immaterial because Pingtan's public filings make clear that Pingtan ceased operations in Indonesia in February 2015 and did not resume operations during the putative class period.  Furthermore, Pingtan's public filings accurately portray certain of its fishing licenses as being obtained and held through related third-party entities and contradict Plaintiff's allegations suggesting that Pingtan stated that Timor-Leste issued licenses directly to Pingtan rather than to vessels controlled by the company.  Accordingly, there is nothing misleading about Pingtan's statements concerning Timor-Leste.

<u>Third</u>, Plaintiff fails to plead scienter.  Not only does Plaintiff fail to meet the stringent requirements of pleading scienter against an individual whose scienter could be imputed to Pingtan, but Plaintiff also fails to allege a statement "so dramatic" as to allow an inference of corporate scienter.  This is particularly true in light of the comprehensive public disclosures that Pingtan had ceased fishing operations in Indonesia.

Accordingly, Plaintiff fails to state a securities fraud claim against Pingtan, and the Court should dismiss the Amended Complaint.

## STATEMENT OF FACTS[1]

### The Parties

Plaintiff Lynda Huang claims to have purchased Pingtan's securities during the putative class period (March 9, 2016 through May 10, 2017) and seeks certification of a purported class. (Katze Dec. Ex. A ¶¶ 1, 15)

Defendant Pingtan is a Cayman Islands exempted limited liability company with its principal business and/or material operations in the People's Republic of China.  (Katze Dec. Ex. F at 5; *see also* Katze Dec. Ex. A ¶ 16)  Pingtan is a marine enterprises group that primarily engages in ocean fishing through its operating subsidiary, Fujian Provincial Pingtan County Ocean Fishing Group Co. ("Pingtan Fishing").  (Katze Dec. Ex. F at 27; *see also* Katze Dec. Ex. A ¶ 16)

Defendant Xinrong Zhuo, Pingtan's Founder, was Chief Executive Officer and Chairman of the Board of Directors, and Defendant Roy Yu was Pingtan's Chief Financial Officer during the putative class period.  (Katze Dec. Ex. A ¶¶ 17-18) (collectively Mr. Yu and Mr. Zhuo are referred to as the "Individual Defendants")[2]

### The Allegations of the Amended Complaint

Plaintiff alleges that Pingtan deceived investors by making materially false or misleading statements or omissions.  (Katze Dec. Ex. A ¶¶ 30-65)  In particular, Plaintiff alleges that Pingtan made "misrepresentations about being licensed to fish in Indonesian waters" and

---

[1] A true and correct copy of the Amended Class Action Complaint for Violation of the Federal Securities Laws, dated May 29, 2018 (the "Amended Complaint"), is annexed as Exhibit A to the accompanying Declaration of Samantha J. Katze ("Katze Dec.").  A true and correct copy of the Aurelius Article is Exhibit B to the Katze Dec.

[2] The Individual Defendants have not been served with process and are not parties to this motion.

"misrepresented that it had obtained fishing licenses from the government of Timor-Leste to fish

in Timorese waters."  (Katze Dec. Ex. A ¶ 48)

The Amended Complaint identifies five public filings that it alleges contain supposedly

false and misleading statements concerning Pingtan's licensing to fish in Indonesian waters:

- Pingtan's 10-K for 2015 ("2015 10-K").  "Among [Pingtan's] 135 fishing vessels, *117 of these vessels are licensed to operate in the Arafura Sea in Indonesia* but temporarily not operating due to [the Moratorium]" and "[w]e currently operate 135 fishing vessels and *have a license to operate 117 of these vessels operate (sic) in the Arafura Sea of Indonesia*."  (Katze Dec. Ex. A ¶¶ 32-33 (emphasis added and modifications by Plaintiff))

- Pingtan's 10-Q for the first quarter of 2016 ("2016 Q1 10-Q").  "Among [Pingtan's] 135 fishing vessels, *117 of these vessels are licensed to operate in the Arafura Sea in Indonesia* but temporarily not operating due to the [Moratorium]." (Katze Dec. Ex. A ¶ 36 (emphasis added and modifications by Plaintiff))

- Pingtan's 10-Q for the second quarter of 2016 ("2016 Q2 10-Q").[3]  "As of June 30, 2016, we own 107 trawlers, 4 longline fishing vessels, 2 squid jigging vessels and 2 drifters and have exclusive operating license rights to 20 drifters…*These vessels are fully licensed to fish in Indonesian*, Indian, or Western and Central Pacific Ocean of the International waters." (Katze Dec. Ex. A ¶ 39 (emphasis added by Plaintiff))

- Pingtan's 10-Q for the third[4] quarter of 2016 ("2016 Q3 10-Q").  "As of September 30, 2016, we own 107 trawlers, 4 longline fishing vessels, 2 squid jigging vessels and 2 drifters and have exclusive operating license rights to 20 drifters…*These vessels are fully licensed to fish in Indonesian*, Indian, or Western and Central Pacific Ocean of the international waters" (Katze Dec. Ex. A ¶ 42 (emphasis added and modifications by Plaintiff))

- Pingtan's 10-K for 2016 ("2016 10-K").  "*Among [Pingtan's] 135 fishing vessels*, 13 are operating in Indo-Pacific waters; 12 are operating in the Bay of Bengal in India; 2 are operating in international waters of Southwest Atlantic and Southeast Pacific Oceans; 4 will be operating in international waters of Pacific Ocean upon completion of paperwork formalities, and *the remaining vessels are licensed to operate in the Arafura Sea in Indonesia but temporarily not operating due to the moratorium discussed below*", and that "[w]e currently operate 135 fishing vessels and *have a license to operate 104 of*

---

[3] The Amended Complaint incorrectly alleges that Pingtan's 2016 Q2 10-Q was filed with the SEC on May 8, 2016.  (Katze Dec. Ex. A ¶ 37)
[4] Paragraph 40 of the Amended Complaint refers to the "second quarter of 2016", but that is a typographical error.

*these vessels operate (sic) in the Arafura Sea of Indonesia*." (Katze Dec. Ex. A ¶¶ 45-46 (emphasis added and modifications by Plaintiff))

According to Plaintiff, these statements were false and misleading because Pingtan and Pingtan's vessels were never licensed to fish in Indonesian waters. (Katze Dec. Ex. A ¶¶ 5-6; 47)[5]

    In addition, Plaintiff takes issue with a press release concerning Pingtan's licenses to fish in Timor-Leste.  (Katze Dec. Ex. A ¶ 49)  The pleading also identifies a statement in two of Pingtan's public filings that supposedly repeated the press release.  (Katze Dec. Ex. A ¶ 50) Specifically, Plaintiff alleges that, on August 4, 2016, Pingtan issued a press release "announc[ing] that thirteen of its vessels ha[d] obtained fishing licenses from the Ministry of Agriculture and Fisheries of Timor-Leste, allowing them to operate in the sea areas of Timor-Leste."  (Katze Dec. Ex. A ¶ 49)  Plaintiff further alleges that Pingtan's 2016 Q2 10-Q and 2016 Q3 10-Q stated: "Among [Pingtan's] 135 fishing vessels, 13 vessels have obtained fishing licenses from the Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste and will operate in the sea area of Democratic Republic of Timor-Leste."  (Katze Dec. Ex. A ¶ 50)  According to Plaintiff, these statements were false and misleading because the Timorese fishing licenses were not issued to Pingtan, but to Hong Long, "a different company that is owned and controlled by Defendant Zhuo's wife."  (Katze Dec. Ex. A ¶ 51)

    Plaintiff further alleges that these public filings were signed by the Individual Defendants and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of financial reporting, the disclosure of any material changes to Pingtan's internal controls over financial reporting and the disclosure of all fraud.  (Katze Dec. Ex. A ¶¶ 30-31, 34-

---

[5] Relevant excerpts from the 2015 10-K, 2016 Q1 10-Q, 2016 Q2 10-Q, 2016 Q3 10-Q and 2016 10-K are annexed as Exhibits C, D, E, F and G to the Katze Dec., respectively.

35, 37-38, 40-41, 43-44)[6]

**Plaintiff's Allegations Regarding Scienter**

Plaintiff alleges that the scienter of the Individual Defendants and that of other unidentified Pingtan employees and agents should be imputed to Pingtan. (Katze Dec. Ex. A ¶ 22) In conclusory fashion, Plaintiff further alleges that Mr. Zhuo and Mr. Yu (1) "directly participated in the management of" Pingtan; (2) were "directly involved in the day-to-day operation of [Pingtan] at the highest levels"; (3) were "privy to confidential proprietary information concerning [Pingtan] and its business and operations"; (4) were "directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged" in the Amended Complaint; (5) were "directly or indirectly involved in the oversight or implementation of [Pingtan's] internal controls"; and/or (6) were "aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning [Pingtan]." (Katze Dec. Ex. A ¶ 19) Plaintiff also alleges that Mr. Zhuo is "intimately involved in all aspects of Pingtan's operations" and that Mr. Yu led other "fraudulent Chinese companies listed in U.S." (Katze Dec. Ex. A ¶¶ 66, 67)

**Pingtan's Public Disclosures Regarding Its Fishing Operations In Indonesia**

Pingtan's public filings disclose that Pingtan relies on third parties to obtain fishing licenses: "The growth of our business depends on our ability to secure fishing licenses directly or through third parties." (Katze Dec. Ex. G at 7) Pingtan's public filings also disclose that "PT. Avona Mina Lestari and PT. Dwikarya Reska Abadi act as Pingtan Fishing's agents to apply and

---

[6] It is not clear whether Plaintiff is alleging that the SOX certifications were material misstatements. However, to the extent Plaintiff is so alleging, Plaintiff's claim fails because "Plaintiff does not allege any particularized facts which would suggest that the actions articulated in the SOX Certifications were not undertaken by the individual defendants or for that matter any factual allegations concerning [Pingtan's] financial reporting." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013).

renew Indonesia fishing licenses and Pingtan Fishing pays the agent service fees to them."

(Katze Dec. Ex. G at F-22; *see also* Katze Dec. Exs. C at F-22; E at 19; F at 20)

Yet, regardless of whether Pingtan or its vessels were licensed to fish in Indonesia, Pingtan's public filings make clear that: (1) in February 2015, Pingtan stopped operating in Indonesian waters; (2) because Pingtan derived a majority of its revenue from fishing in Indonesian waters, the suspension of fishing operations in Indonesia had and would continue to have a significant negative impact on Pingtan; and (3) Pingtan's fishing operations in Indonesia continued to be suspended.  (*See generally* Katze Dec. Exs. C, D, E, F and G)

The 2015 10-K, under the heading **"Significant factors affecting our results of operations**," discloses:

> Since February 2015, we have temporarily ceased operations in the Indonesian waters.  Since we derive a majority of our revenue from this area, this temporary ban has caused a significant drop in our production. As a result, our sales for the year ended December 31, 2015 decreased significantly as compared to the year ended December 31, 2014.

(Katze Dec. Ex. C at 33; *see also* Exs. C at 5, 13 and 35 (mentioning Indonesian ban); D at 27, 28, 29, 38; E at 27, 29, 41; F at 28, 30, 40 (mentioning the "ban" on fishing in Indonesia))

Pingtan's 2016 10-K also makes clear that Pingtan is not operating in Indonesian waters, stating on page two: "From February 2015, we temporarily ceased operations in the Indonesian waters.  Since we derive a majority of our revenue from this area, ***this temporary ban*** has caused a significant drop in our production."  (Katze Dec. Ex. G at 2 (emphasis added))  A few pages later, under the heading ***"Risks Relating to Our Business*,"** Pingtan repeats this notice.  (Katze Dec. Ex. G at 7; *see also* Katze Dec. Ex. G at 29 (**"Significant factors affecting our results of operations**," "Since February 2015, we have ceased operations in the Indonesian waters.  Since we derive a majority of our revenue from this area, ***this ban*** has caused a significant drop in our

7

production.") (emphasis added)); at 31 ("this temporary ban has caused a significant drop in our

production."); at 36 ("this temporary ban has caused a significant drop in our production."))

Similarly, Pingtan's 2015 10-K, 2016 Q1 10-Q, 2016 Q2 10-Q, 2016 Q3 10-Q and 2016

10-K disclose that suspension of fishing operations in Indonesia negatively impacts Pingtan.

(Katze Dec. Exs. C, D, E, F and G)

- 2015 10-K: "117 of the Company's 135 vessels *were operating* in Indonesian waters and significant portion of revenue *was derived* from them.  Suspension of fishing operation in Indonesian waters has had and will continue to have a significant negative impact on the Company." (Katze Dec. Ex. C at F-17 (emphasis added))

- 2016 Q1 10-Q: "117 of the Company's 135 vessels *were operating* in Indonesian waters and significant portion of revenue *was derived* from them.  Suspension of fishing operating in Indonesian waters has had and will continue to have a significant negative impact on the Company." (Katze Dec. Ex. D at 14 (emphasis added))

- 2016 Q2 10-Q: "We derive majority of our revenue from Indonesian waters, the suspension of fishing operation in this area has had and will continue to have significant negative impact on the Company." (Katze Dec. Ex. E at 14)

- 2016 Q3 10-Q: "As the Company has historically derived the majority of its revenue from Indonesian waters, the suspension of fishing operation in this area has had and will continue to have a significant negative impact on the Company." (Katze Dec. Ex. F at 14)

- 2016 10-K: "As the Company has historically derived the majority of its revenue from Indonesian waters, the suspension of fishing operation in this area has had and will continue to have a significant negative impact on the Company." (Katze Dec. Ex. G at F-16)

**Pingtan's Public Disclosures Regarding Its Fishing Operations In Timor-Leste**

Pingtan's public filings and statements also make clear that Pingtan obtains fishing

licenses through Hong Long, a related third party, and that the Timorese licenses were issued to

Pingtan-controlled vessels.  (Katze Dec. Ex. C at 8, F-22; *see also* Exs. D at 26; E at 26; F at 27;

G at 5; H at 1; I at 2)  The August 4, 2016 press release, titled "PINGTAN MARINE

ENTERPRISE HAS ACCESS TO FISHING LICENSES FROM TIMOR-LESTE Company-

Controlled Vessels Expected to Operate in Timor-Leste," states that Pingtan "today announced

that thirteen fishing vessels **controlled by the Company** have obtained fishing licenses from the

Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste."  (Katze Dec. Ex.

H at 1 (emphasis added))  Pingtan made a similar disclosure in its August 5, 2016 8-K:

> On August 4, 2016, Pingtan Marine Enterprise Ltd. (Nasdaq:
> PME) (the "Company") issued a press release to announce that
> thirteen fishing vessels **controlled by the Company** have obtained
> fishing licenses from the Ministry of Agriculture and Fisheries of
> Democratic Republic of Timor-Leste and are expected to operate
> in the sea area of Democratic Republic of Timor-Leste.

(Katze Dec. Ex. I at 2 (emphasis added))

Moreover, Pingtan's public filings disclose the relationship between Hong Long and

Pingtan, explaining that Pingtan acquired 46 boats from Hong Long in June 2013 and that, while

registrations for all boats had not yet been transferred, Pingtan fully owned and had full

operating rights to the vessels:

> On June 19, 2013, the Company entered into a master agreement
> ("Master Agreement") with a related party, Fuzhou Honglong
> Ocean Fishery Co., Ltd ("Hong Long") to acquire 46 fishing
> vessels with total consideration of $410.1 million. . . . Since June
> 2013, the Company has had full ownership of the vessels and the
> full right to operate the vessels and is in the process of registering
> the vessels under the name of the Company's PRC operating
> company. Currently, 20 of the 46 vessels are formally registered to
> the Company. The vessels are in the process of being registered
> under the name of the Company's PRC operating company and it
> will obtain the entire title registration document for the vessels, as
> required by Chinese laws and regulations according to the terms of
> the Master Agreement.

(Katze Dec. Ex. C at 8; *see also* Ex. G at 5)  Pingtan's filings also make clear that Hong Long is

a related party owned by the wife of Pingtan's CEO, and that Hong Long applies for and renews

fishing licenses for Pingtan.  (Katze Dec. Exs. C at 8, 10, F-22; G at 5, 7)

In fact, Pingtan's 2015 10-K details Pingtan's relationship with Hong Long: (1) "The major shareholder of Hong Long is Ms. Ping Lin, spouse of Xinrong Zhuo, the Company's Chairman and CEO, who holds 66.5% of Hong Long" (Katze Dec. Ex. C at 8); (2) "Hong Long is an affiliate company majority owned and controlled by Ping Lin, spouse of [Pingtan's] CEO" (Katze Dec. Ex. C at F-22); and (3) "Hong Long act[s] as [an] agent[] to apply fishing licenses for [Pingtan] and pay the related fishing license application fees on behalf of [Pingtan]." (Katze Dec. Ex. C at F-22)  Pingtan's 2016 10-K contains some of the same disclosures. (*See* Katze Dec. Ex. G at 5, F-20)  Pingtan's 2016 Q1 10-Q similarly identifies Hong Long as a "related party."  (Katze Dec. D at 26)  So do Pingtan's 2016 Q2 10-Q and 2016 Q3 10-Q.  (Katze Dec. Exs. E at 26; F at 27)

The 2016 10-K also explains that "[t]he growth of [Pingtan's] business depends on [Pingtan's] ability to secure fishing licenses directly or through third parties."  (Katze Dec. Ex. G at 7)  Accordingly, Pingtan's 2016 Q2 10-Q and 2016 Q3 10-Q state that "13 vessels have obtained fishing licenses from the Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste"  (Katze Dec. Exs. E at 26; F at 27), not that Pingtan itself has obtained licenses.

**The Purported "Corrective Disclosure" in the Aurelius Article**

According to Plaintiff, an article published on the website www.aureliusvalue.com on May 10, 2017, the Aurelius Article, revealed purported fraud.  (Katze Dec. Ex. A. ¶¶ 9, 52-53)  Specifically, based on a review of Pingtan's public filings and other publicly available information, the Aurelius Article questions Pingtan's value.  (Katze Dec. Ex. B)  Based on this public information, the Aurelius Article expresses the "opinion" that Pingtan "has engaged in fraudulent activities that conceal the reality that its shares likely have zero value."  (Katze Dec. Ex. B at 26)  Plaintiff alleges that Pingtan's stock price dropped 28% after the Aurelius Article was published.  (Katze Dec. Ex. A ¶ 61)

## **ARGUMENT**

To withstand a motion pursuant to Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Stinnett v. Delta Airlines, Inc.*, 278 F. Supp. 3d 599, 606 (E.D.N.Y. 2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted)).  While a court must "'accept as true all [factual] allegations contained in the complaint,'" it "need not accept 'legal conclusions,'" and "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice' to insulate a claim against dismissal." *Id.* at 606.

In addition, "[a] complaint alleging securities fraud under Section 10(b) of the Exchange Act is subject to two heightened pleading standards": Rule 9(b) and the requirements of the PSLRA.  *Orlan v. Spongetech Delivery Sys., Inc., Sec. Litig.*, Nos. 10-CV-4093 (DLI) (JMA), 10-CV-4104 (DLI) (JMA), 2012 WL 1067975 at *7 (E.D.N.Y. Mar. 29, 2012).  Rule 9(b) requires a plaintiff to: "(1) specify the statements plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 171 (E.D.N.Y. 2017) (internal citations and quotation marks omitted).  Similarly, the PSLRA requires that a complaint specify each misleading statement, set forth the facts "'on which [a] belief' that a statement is misleading was 'formed'"; and "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Orlan*, 2012 WL 1067975, at *7.

To state a claim for relief under Section 10(b) and Rule 10b-5, a plaintiff must plead that: "(1) the defendant made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *IBEW Local Union No. 58 Pension Fund & Annuity Fund v. Royal Bank of Scotland Group, PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (citing *Stoneridge Inv. Partners, LLC v.*

11

*Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008)).  With respect to supposed omissions, a complaint must "allege that the corporation is subject to a duty to disclose the omitted facts."  *Orlan*, 2012 WL 1067975, at *8.

The materiality of an alleged misrepresentation or omission "depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'"  *ECA, Local 134 IBEW Joint Pension Trust*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks and citation omitted).  "In other words, a material misstatement or omission is one that 'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Pingtan I*, 195 F. Supp. 3d at 494 (citing *ECA, Local 134 IBEW Joint Pension Trust*, 553 F.3d at 197.  In determining whether an alleged misrepresentation is material, courts "engage in a fact-specific inquiry."  *ECA, Local 134 IBEW Joint Pension Trust*, 553 F.3d at 197 (internal citation omitted).  "In resolving a motion to dismiss, filed under Rule 12(b)(6), courts may consider 'any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the S.E.C., and documents possessed by or known to the plaintiff upon which it relied in bringing suit.'"  *Orlan*, 2012 WL 1067975, at *2 n.3.

## I.   PLAINTIFF FAILS TO PLEAD LOSS CAUSATION BECAUSE THE AURELIUS ARTICLE IS BASED ON PUBLIC INFORMATION

In order "[t]o plead loss causation, a plaintiff must plausibly allege 'that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'"  *Central States, Southeast & Southwest Areas Pension Fund v. Fed. Home Loan Mortgage Corp.*, 543 Fed. Appx. 72, 74 (2d Cir. 2013) (Summary Order)

(affirming dismissal based on *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir.

2010)).  However, "third-party articles and reports express[ing] negative *opinions* . . . based on

information that was already publicly available . . . . are not 'corrective' for the purpose of

pleading loss causation."  *Id.* at 75.  Thus, "[a] negative journalistic characterization of

previously disclosed facts does not constitute a corrective disclosure of anything but the

journalists' opinions." *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d at 512.

In *Omnicom*, the plaintiff had asserted that information contained in an article published

in *The Wall Street Journal* constituted a partial corrective disclosure of fraud.  597 F.3d at 511.

The district court held that plaintiff "proffered no evidence sufficient to support a finding of loss

causation."  *Id.* at 503.  The Second Circuit affirmed, reasoning that "[b]ecause appellant failed

to demonstrate any new information in [*The Wall Street Journal*] article regarding Omnicom's

alleged fraud, appellant ha[d] failed to show a price decline due to a corrective disclosure."  *See*

597 F.3d at 513.

The same reasoning applies here.  The Aurelius Article describes Pingtan's purchase of

ships from Hong Long and cites "Source: Pingtan SEC Filings."  Similarly, to support assertions

concerning ownership of Pingtan's ships, the Aurelius Article cuts and pastes a chart directly

from Pingtan's 2015 10-K.  (Katze Dec. Exs. B at 18; C at F-24)  The Aurelius Article's

conclusion that Pingtan's Indonesian fishing licenses never existed is also based on public

information, including an August 27, 2015 Indonesian news article, which the Aurelius Article

reproduces.  (Katze Dec. Ex. B at 8-9)  The Amended Complaint also alleges that the Aurelius

Article references Indonesian news articles.  Thus, Plaintiff admits that the information

underlying its allegations concerning Pingtan's Indonesian fishing licenses is public.  (Katze

Dec. Ex. A ¶¶ 53-55)  Moreover, the "evidence" underlying the Aurelius Article's conclusion

that the "Timorese fishing licenses were awarded to Honglong, not Pingtan" is a Chinese

Embassy news release from November 2016 and a *Sydney Morning Herald* article from February

2017.  (Katze Dec. Exs. B at 17; J; A ¶¶ 58, 60)  All of these sources predate the Aurelius

Article.

The Aurelius Article author concedes that the article "represents the opinion of the author

. . . based upon information reasonably available to the author and obtained from sources the

author believes to be reliable."  (Katze Dec. Ex. B at 1)  The author cautions that "such

information and sources cannot be guaranteed as to their accuracy or completeness" and that

"[t]he author makes no representations as to the accuracy or completeness of the information set

forth in" the article.  (Katze Dec. Ex. B at 1)

Thus, the Aurelius Article did not reveal any undisclosed <u>facts</u>.  Rather, it relied on public

information and represented the "author's opinion" that Pingtan's "<u>shares are likely worthless</u>"

and that "shareholders are likely to be left with total losses."  (Katze Dec. Ex. B at 3)  Such

"raising of questions and speculation by analysts and commentators does not reveal any 'truth'

about an alleged fraud" for purposes of loss causation.  *Janbay v. Canadian Solar, Inc.*, 10 Civ.

4430 (RWS), 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012).

In this regard, *Pingtan I* is instructive.  There, plaintiff alleged loss caused by a purported

corrective disclosure in an online article apparently written by an amateur stock analyst.  Just like

the Aurelius Article, the article in *Pingtan I* was based on public information and included the

author's negative opinion based on that information.  *Pingtan I*, 195 F. Supp. at 496-97.  Judge

Nathan dismissed the complaint on the ground that, *inter alia*, the plaintiff failed to plead loss

causation because "to establish loss causation, a corrective disclosure must 'reveal some then-

undisclosed fact with regard to the specific misrepresentations alleged in the complaint,'"  (*Id.*

citing *Omnicom*), and the article at issue was "based solely on public information." *Id.* at 496. Relying on *Omnicom*, the court held that the article constituted only "'[a] negative journalistic characterization of previously disclosed facts'" which "'does not constitute a corrective disclosure of anything but the journalists' opinions.'" *Id.* at 497 (citing *Omnicom*). Accordingly, the court found that plaintiff had failed to state a securities fraud claim against Pingtan. *Id.* at 499.

Here too, the Amended Complaint does not allege loss causation because it does not plausibly allege that purported misstatements or omissions concerning licenses to fish in Indonesia and Timor-Leste "concealed something from the market that, when disclosed, negatively affected the value of the security." *Central States, Southeast & Southwest Areas Pension Fund*, 543 Fed. Appx. at 74.

## II.     PLAINTIFF FAILS TO ADEQUATELY PLEAD A MATERIAL MISREPRESENTATION OR OMISSION

### A.     Plaintiff Has Not Pled A Material Misrepresentation Or Omission Regarding Indonesian Fishing Licenses

The Amended Complaint alleges that Pingtan's SEC filings falsely state that "a majority of Pingtan's fishing vessels are licensed by the Indonesian government to fish in Indonesian waters" when "[i]n actuality, Pingtan never had any licenses to fish in Indonesian waters." (Katze Dec. Ex. A ¶¶ 5-6) Plaintiff relatedly contends that Pingtan's statements were "false and misleading because . . . Pingtan's vessels were never licensed to fish in Indonesian waters." (Katze Dec. Ex. A ¶ 47) These allegations do not state a claim because they do not amount to a material misrepresentation or omission.

Plaintiff's allegations that Pingtan misstated or omitted facts because Pingtan and its vessels ***"never"*** had licenses to fish in Indonesia are belied by other allegations in the Amended Complaint and by documents that the Court may properly consider on this motion.

15

For example, Paragraph 65 of the Amended Complaint discusses Pingtan's March 14, 2018 10-K and alleges, *inter alia*, that "Defendants further stated 'the Company's vessels located in Indonesia currently do not have active local fishing licenses as they were either revoked or have lapsed, since the moratorium prevented renewing of fishing license." (Katze Dec. Ex. A ¶ 65)  In addition, the Aurelius Article states that "Pingtan's Indonesian affiliates also appear to have operated without licenses for ***substantial portions*** of their fleet."  (Katze Dec. Ex. B at 15 (emphasis added))  Moreover, Pingtan's public filings make clear that Pingtan obtains Indonesian fishing licenses through third parties, specifically, PT. Avona Mina Lestari and PT. Dwikarya Reksa Abadi.  (Katze Dec. Ex. G at F-22; *see also* Katze Dec. Exs. C at F-22; E at 19; F at 20)  In light of these contradictions, the Court need not take as true Plaintiff's allegations that Pingtan or its vessels were ***"never"*** licensed to fish in Indonesia.  *See Adam Plotch LLC v. World Savings Bank, FSB*, 15-CV-06142 (FB)(RER), 2018 WL 327247, at *1 (E.D.N.Y. Jan. 8, 2018) ("[T]he requirement to accept factual allegations as true is 'inapplicable . . .' to matters that are 'contradicted by more specific allegations or documentary evidence.'").

In any case, even if Pingtan and its vessels were never licensed to fish in Indonesian waters, Plaintiff fails to plausibly allege how that would significantly alter the "total mix" of available information from the viewpoint of a reasonable investor during the putative class period.  In fact, whether Pingtan was licensed could not have been material to a reasonable investor during the putative class period when considered in the context of the total mix of available information set forth in Pingtan's public filings between March 9, 2016 and May 10, 2017.  *Pingtan I*, 195 F. Supp. 3d at 494-96.  That is true because Pingtan's public filings make clear that Pingtan stopped fishing in Indonesia in February 2015.  (Katze Dec. Ex. C at 33; *see also* at 5, 13 and 35 (mentioning Indonesian ban); *see also* Exs. D at 27, 28, 29 and 38; E at 27,

29 and 41; F at 28, 30 and 40 (mentioning the "ban" on fishing in Indonesia); G at 2, 7, 29, 31 and 36)  Thus, Pingtan's public filings made clear to any reasonable investor during the putative class period that Pingtan was *not* fishing in Indonesia.

Grasping at straws, Plaintiff seemingly attempts to allege materiality by quoting a Pingtan statement that "Pingtan's revenue is heavily dependent on its fishing activities in Indonesian waters."  (Katze Dec. Ex. A ¶ 62)  But that statement cannot be viewed in isolation, *Rombach v. Chang*, 355 F.3d 164, 177 n.11 (2d Cir. 2004), and, in any event, on its own, does not render Pingtan's alleged misstatements concerning Indonesian fishing licenses material given Pingtan's repeated and comprehensive public disclosure that it was not fishing in Indonesia during the putative class period and had not done so since February 2015, which resulted in a significant drop in Pingtan's production and significant negative impact on the company.  (Katze Dec. Exs. C at 5, 13, 33, 35 and F-17; D at 14, 27, 29 and 38; E at 14, 27, 29 and 41; F at 14 and 28; G at 2, 7, 29, 31, 36, and F-16)  Accordingly, try as she may, Plaintiff simply cannot ignore the numerous instances in which Pingtan disclosed that the suspension of fishing operations in Indonesia had had and would continue to have a negative impact on the company because Pingtan historically had derived a majority of its revenue from the area. (*Id.*)

Plaintiff points to Pingtan's statement in the May 10, 2017 press release that "[t]he Company considers the value of its fleet relatively similar to the taxi medallion market where the value of the limited license is greater than the physical cost of the means of transportation." (Katze Dec. Ex. A ¶ 63)  But that allegation is also insufficient.  Regardless of how Pingtan values its fleet, Pingtan was not fishing in Indonesia.  (Katze Dec. Exs. C at 5, 13, 33, 35 and F-17; D at 14, 27, 29 and 38; E at 14, 27, 29 and 41; F at 14 and 28; G at 2, 7, 29, 31, 36, and F-16)

Accordingly, even accepting for purposes of this motion that Pingtan's statements

concerning whether it was licensed to fish in Indonesia were false or misleading, Plaintiff has not plausibly alleged that such purported misrepresentations would be material.  Indeed, regardless of whether Pingtan was licensed to fish in Indonesia, "the underlying state of affairs described in the public filings remains the same."  *Pingtan I*, 195 F. Supp. 3d at 496.  Specifically, Pingtan was banned from fishing in Indonesia and had not done so since February 2015.  (Katze Dec. Exs. C at 5, 13, 33 and 35; D at 27, 28, 29 and 38; E at 27, 29 and 41; F at 28, 30 and 40; G at 2, 7, 29, 31 and 36)

> **B.     Plaintiff Has Not Alleged Any Material Misrepresentations or Omissions Regarding The Timor-Leste Licenses**

A plaintiff alleging securities fraud "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174 (emphasis added).  "Defendants cannot be alleged to have misrepresented or omitted that which they plainly disclosed."  *In re Apple REITs Litig.*, 11-CV-2919 (KAM), 2013 WL 1386202, at *12 (E.D.N.Y. Apr. 3, 2013), *vacated in part on other grounds*, 563 Fed. Appx. 81 (2d Cir. 2014) (Summary Order).

Here, Plaintiff claims that Pingtan falsely stated in its 2016 Q2 10-Q and 2016 Q3 10-Q that "[a]mong [Pingtan's] 135 fishing vessels, 13 vessels have obtained fishing licenses from the Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste and will operate in the sea area of Democratic Republic of Timor-Leste."  (Katze Dec. Ex. A ¶ 50 (modification by Plaintiff))  Plaintiff further alleges that such purportedly false statements repeated a similarly false announcement Pingtan made in an August 4, 2016 press release.  (*Id.*)  But, as set forth below, Plaintiff has failed to plausibly allege that there is anything false or misleading about these statements.  And, regardless, Plaintiff fails to plead with particularity how or why such statements would have purportedly misled investors, and, accordingly, Plaintiff also fails to

18

satisfy Rule 9(b).

According to Plaintiff, Pingtan's statements concerning Timor-Leste were false and misleading because "the Timorese fishing licenses were not issued to Pingtan" but rather to "Hong Long, a different company that is owned and controlled by Defendant Zhuo's wife." (Katze Dec. Ex. A ¶ 51)  Yet, whether licenses were issued to Hong Long rather than Pingtan does not make Pingtan's statements false or misleading -- Pingtan disclosed in public filings that Pingtan acquired vessels from Hong Long.  (Katze Dec. Exs. C at 8; D at 26; E at 26; F at 27; G at 5)  Pingtan further disclosed that it "has had full ownership of . . . and the full right to operate the vessels" since June 2013, even if not all the vessels were officially registered to Pingtan. (Katze Dec. Ex. C at 8; *see also* Ex. G at 5)  Moreover, Pingtan's public filings do not state or even imply that the government of Timor-Leste issued licenses directly to Pingtan.  Rather, Pingtan clearly states that "13 vessels have obtained fishing licenses" from Timor-Leste.  (Katze Dec. Exs. E at 26; F at 27)  And any assertion that Pingtan represented otherwise is belied by the title of the August 4, 2016 press release -- "PINGTAN MARINE ENTERPRISE HAS ACCESS TO FISHING LICENSES FROM TIMOR-LESTE Company-Controlled Vessels Expected to Operate in Timor-Leste" -- and destroyed by the language of the press release itself, which expressly states that "thirteen fishing vessels *controlled by the Company* . . . obtained fishing licenses from the Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste." (Katze Dec. Ex. H at 1 (emphasis added))  To the extent there is any doubt, Pingtan's August 5, 2016 8-K attaching the press release repeats the announcement that "thirteen fishing vessels *controlled by the Company* have obtained fishing licenses from the Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste."  (Katze Dec. Ex. I at 2 (emphasis added))

Apparently anticipating Pingtan's argument that the alleged misstatements concerning the

Timor-Leste licenses are not false or misleading because Pingtan controls the Hong Long fishing vessels, Plaintiff, relying on a *Sydney Morning Herald* article, pleads that "such an argument is spurious because Pingtan assured the Timorese government that it had nothing to do with those vessels." (Katze Dec. Ex. A ¶ 59)  Yet, the *Sydney Morning Herald* article that Plaintiff cites contradicts Plaintiff's contention that Pingtan's claim to control the vessels is "spurious."  It states that "[t]he Chinese company running the boats" in question was "Pingtan Marine Enterprise." (Katze Dec. Ex. J at 4)  Thus, when viewed in its entirety, the article is consistent with Pingtan's public statements that Timor-Leste issued licenses to vessels controlled by Pingtan, which Pingtan's public filings disclose that Pingtan acquired from Hong Long.

Furthermore, insofar as Plaintiff's claim can be construed as arising out of a material omission, Plaintiff has not alleged that Pingtan had any duty to expressly spell out, let alone specifically disclose, that the Timor-Leste licenses were issued to Hong Long when Pingtan disclosed that the vessels at issue were owned and controlled by Pingtan.  *Orlan*, 2012 WL 1067975, at *8.

In addition, Plaintiff has not plausibly alleged that any purported misstatements or omissions were material.  Regardless of whether the licenses were issued to Pingtan or Hong Long, Pingtan disclosed that it had fully owned and had full rights to operate the vessels with respect to which the licenses were issued since June 2013.  (Katze Dec. Ex. C at 8; *see also* Ex. G at 5)  Thus, the fact that the licenses were issued to Hong Long instead of Pingtan would not have significantly altered the total mix of information available to the reasonable investor during the putative class period because it would not change the fact that, as Pingtan disclosed, vessels controlled by Pingtan obtained licenses to fish in Timor-Leste.  (Katze Dec. Exs. E at 26; F at 27; H; I)

20

## III.   PLAINTIFF FAILS TO PLEAD SCIENTER SUFFICIENTLY

The PSLRA requires plaintiffs to allege "with particularity . . . the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). Plaintiffs must allege facts giving rise to a "strong inference" of scienter; that is, a plaintiff must show that the "inference of scienter [is] more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. "[G]enerally speaking, the inference of scienter 'may arise where the complaint sufficiently alleges that the defendants (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 372 (E.D.N.Y. 2013).  In determining whether a plaintiff has sufficiently alleged scienter, "[t]he court 'must assess whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* at 372-73 (internal citations omitted).

To plead scienter against a corporation, a plaintiff must plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  As against an individual, plaintiffs may allege scienter by alleging (1) "facts to show that defendants had both motive and opportunity to commit fraud" or (2) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006).  Plaintiffs may also allege corporate scienter where a corporate statement is so "dramatic" that it "would have been approved by

21

corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Teamsters Local 445 Freight Div. Pension Fund*, 531 F.3d at 195-96 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).

### A.   Plaintiff Has Not Pled Facts Sufficient To Allege Individual Scienter That Can Be Imputed To Pingtan

Plaintiffs do not meet the "stringent" requirements of pleading scienter against any individual whose scienter could be imputed to Pingtan.  *See, e.g.*, *Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 Fed. Appx. 55 (2d Cir. 2018) (Summary Order).

"The element concerning 'motive and opportunity to defraud' requires a showing that defendants 'benefitted in some concrete and personal way from the purported fraud.'" *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 371.  Plaintiff here alleges no motive whatsoever with respect to Mr. Zhuo or Mr. Yu.  For example, the Amended Complaint contains no allegations that the Individual Defendants benefitted from the alleged fraud.  In that regard, motives possessed by most corporate officers, such as the desire to make a corporation appear profitable, do not suffice.  *Sfiraiala*, 729 Fed. Appx. 55; *see In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 371-72.

Plaintiff also fails to allege conscious misbehavior or recklessness.  *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 371.  "To prove the defendants acted with recklessness, the plaintiffs must plead 'an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 182 (E.D.N.Y. 2017) (internal citation omitted).

Here, the Amended Complaint contains conclusory assertions regarding Mr. Zhuo's and Mr. Yu's purported involvement in Pingtan's business and operations.  For example, Plaintiff

alleges that they (1) "directly participated in the management of" Pingtan; (2) were "directly involved in the day-to-day operation of [Pingtan] at the highest levels"; (3) were "privy to confidential proprietary information concerning [Pingtan] and its business and operations"; (4) were "directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged" in the Amended Complaint; and (5) were "directly or indirectly involved in the oversight or implemention of [Pingtan's] internal controls." (Katze Dec. Ex. A ¶ 19)  And, regarding Mr. Zhuo, Plaintiff further alleges that he is "intimately involved in all aspects of Pingtan's operations."  (Katze Dec. Ex. A ¶ 66)  However, the fact that the Individual Defendants "occupied high-ranking positions" at Pingtan is insufficient.  *See Cox v. Blackberry Ltd.*, 660 Fed. Appx. 23, 25 (2016) (Summary Order) (affirming dismissal of complaint for failing to plead scienter).  And, regardless, Plaintiff "fails to allege any particularized facts suggesting that defendants actually possessed information contradicting their public statements."  *Cox*, 660 Fed. Appx. at 25.  Plaintiff has therefore failed to plead sufficient circumstantial evidence of conscious misbehavior or recklessness against either Mr. Zhuo or Mr. Yu.[7]  *See Orlan v. Spongetech Delivery Sys., Inc.*, 10-CV-4093 (DLI) (RML), 10-CV-4104 (DLI) (RML), 2017 WL 1131900, at *6-7 (E.D.N.Y. Mar. 24, 2017); *Altayyar*, 242 F. Supp. 3d at 182.[8]

---

[7] Plaintiff's allegations concerning Mr. Yu's purported involvement with other fraudulent companies are also insufficient to allege scienter.  *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 221 (S.D.N.Y. 2008) ("Because accounting-related misconduct is not similar to the nondisclosure of adverse events, Plaintiffs' allegations regarding prior misconduct add little if anything to support an inference of scienter.").

[8] While the Amended Complaint also references unidentified employees whose alleged scienter can purportedly be imputed to Pingtan, other than conclusory statements which are not accepted as true, it "contains no allegations as to whether these other unnamed employees were acting within the scope of employment or if there is any other basis to impute their scienter to the employer."  *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 352.

**B.**     **Plaintiff Has Not Alleged Statements So "Dramatic" As To Infer Scienter**

In addition, Pingtan's representations concerning licenses to fish in Indonesia and Timor-Leste are not so "dramatic" as to infer corporate scienter.  *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 384 ("A strong inference of corporate scienter may also be appropriate 'where a corporate statement is so important and dramatic that it 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'") (internal citations omitted).  That is particularly so given the numerous filings in which Pingtan disclosed that it was banned from Indonesia, had ceased operations in Indonesia in February 2015, and obtains, renews and holds licenses through third-party related entities, including, *inter alia*, Hong Long.  (Katze Dec. Exs. C at 5, 13, 33, 35, F-17 and F-22; D at 14, 27, 28, 29 and 38; E at 14, 19, 27, 29 and 41; F at 14, 20, 28; and G at 2, 7, 29, 31, 36 and F-16) Accordingly, Plaintiff has failed to allege any scienter with respect to the Individual Defendants or Pingtan, and for this reason also, the Court should dismiss the Amended Complaint.

## CONCLUSION

For the foregoing reasons, Pingtan respectfully requests that the Court issue an Order:

(1) dismissing with prejudice the Amended Complaint as against Pingtan; and (2) granting such

other and further relief as the Court deems proper.

Dated:  July 30, 2018
      New York, New York

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP


By:    s/Ronald G. Blum
           Ronald G. Blum
           Yuri Mikulka (*Pro Hac Vice* pending)
           Samantha J. Katze
           7 Times Square
           New York, New York 10036
           Tel:  (212) 790-4500
           Fax:  (212) 790-4545
           rblum@manatt.com
           ymikulka@manatt.com
           skatze@manatt.com

           *Attorneys for Defendant*
           *Pingtan Marine Enterprise Ltd.*