**GLANCY PRONGAY & MURRAY**
Lionel Z. Glancy
Robert V. Prongay
Stan Karas
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (301) 201-9150
Fax: (301) 201-9160
Email: lglancy@glancylaw.com
        rprongay@glancylaw.com
        skaras@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lesley Frank Portnoy
230 Park Avenue
Suite 530
New York, NY 10169
212-682-5340
Fax: 212-884-0988
Email: lportnoy@glancylaw.com

*Counsel for Lead Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZHONG ZHENG, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>PINGTAN MARINE ENTERPRISE LTD., XINRONG ZHUO, and ROY YU,<br><br>    Defendants. | Case No.: 1:17-cv-03807-DLI-ST<br><br>CLASS ACTION<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    SUMMARY OF THE ALLEGATIONS ........................................................... 2

III.   ARGUMENT ...................................................................................................... 4

       A.    Standard of Review.................................................................................. 4

       B.    The Complaint Sufficiently Alleges Loss Causation.............................. 5

       C.    The Complaint Alleges Material Misstatements and Omissions............. 9

             1.    Material Misrepresentations and Omissions Concerning Pingtan's
                   Fictional Indonesian Fishing Licenses......................................... 9

             2.    Material Misrepresentations and Omissions Concerning Pingtan's Non-
                   Existent Timor-Leste Licenses ................................................ 10

       D.    The Complaint Sufficiently Alleges Scienter ....................................... 13

IV.    CONCLUSION................................................................................................. 18

# TABLE OF AUTHORITIES

CASES

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ....................................................................................... 4

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................... 4

*City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*,
    686 F. Supp. 2d 404 (D. Del. 2009) ............................................................. 15, 16

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989) .................................................................................. 14

*Cox v. Blackberry Ltd.*,
    660 Fed. Appx. 23 (2d Cir. 2016) ................................................................. 16, 17

*Dura Pharms, Inc. v. Broudo*,
    544 U.S. 336 (2005) ........................................................................................... 5

*ECA v. JP Morgan Chase Co.*,
    553 F.3d 187 (2nd Cir. 2009) ............................................................................ 13

*Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003) ............................................................................... 5

*Fila v. Pingtan Marine Enterprise Ltd.*,
    195 F. Supp. 3d 489 (S.D.N.Y. 2016) ............................................................... 7, 8

*Freeland v. Iridium World Commns., Ltd.*,
    545 F. Supp. 2d 59 (D.D.C. 2008) ...................................................................... 6

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ............................................................................ 5, 6

*Glazer Capital Mgmt., LP. v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ............................................................................ 15

*Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) .............................................................................. 13

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008) .................................................................. 6

*Heller v. Goldin Restructuring Fund, L.P.*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008)......................................................... 17

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
   93 F. Supp. 2d 424 (S.D.N.Y. 2000)........................................................ 14

*In re Columbia Sec. Litig.*,
   155 F.R.D. 466 (S.D.N.Y. 1994) ................................................................ 6

*In re Countrywide Financial Corp Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................. 14

*In re Credit Suisse-AOL Sec. Litig.*,
   465 F. Supp. 2d 34 (D. Mass. 2006) .......................................................... 5

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013)........................................................ 9

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
   No. 14 Civ. 0950(LAK)(AJP), 2015 WL 249508 (S.D.N.Y. Jan. 20, 2015)........... 15

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) .................................................................. 8

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ............................................ 14

*In re Omnicom Group, Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)...................................................................... 7

*In re Silver Wheaton Corp. Secs. Litig.*,
   No. CV15-5146-CAS(JEMx), 2016 WL 3226004 (C.D. Cal. June 6, 2016) ......... 15

*In re Winstar Commn's*,
   2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).......................................... 8, 14

*Lentell v. Merrill Lynch & Co. Inc.*,
   396 F.3d 161 (2d Cir. 2005)...................................................................... 5

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) .................................................................... 8

*Luce v. Edelstein*,
   802 F.2d 49 (2d Cir. 1986)...................................................................... 18

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ............................................................ 18

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011) ................................................................... 13

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 Fed.Appx. 10 (2d Cir. 2011) .................................................. 8, 10

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)............................................................ 13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ................................................................... 12

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .......................................................... 6

*Scott v. ZST Digital Networks, Inc.*,
    2012 WL 538279 (C.D. Cal. Feb. 14, 2012)................................... 6, 7

*Slayton v. American Express Co.*,
    604 F.3d 758 (2d Cir. 2010)............................................................. 5

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)............................................................ 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)....................................................................... 13

## I.    INTRODUCTION

This is a straightforward case of securities fraud.  Plaintiff alleges that Defendants falsely represented that Defendant Pingtan Marine Enterprise, Ltd. ("Pingtan" or the "Company"), which purports to specialize in fishing, held and maintained proper fishing licenses from the governments of Indonesia and Timor-Leste. In fact, Pingtan never held such licenses, which prevented Pingtan from fishing in the seas that were responsible for the bulk of its revenue. The disclosure of Defendants' fraud caused Pingtan's stock price to plummet by more than 28%.

Defendants do not – and cannot – dispute that they disseminated false information regarding one of their most valuable assets, which granted them the ability to conduct their principal business, *i.e.*, fishing, and without which the Company's other assets (such as vessels) were effectively worthless.  Nevertheless, Defendants now seek to avoid the consequences of their misconduct. First, Defendants argue that Plaintiff may not establish loss causation. As an initial matter, loss causation is a highly fact-specific issue that is generally improper to resolve upon a motion to dismiss. In any event, even though certain corrective information was published in foreign newspapers prior to the report by Aurelius Value, there is no evidence that the market fully appreciated the importance of this information. It was only when the Aurelius Value report was published that the market reacted and the price of Pingtan's stock fell by more than 28% that same day. Clearly, it was the Aurelius Value report, and not some obscure foreign newspaper article, that was the cause of the drop.

Second, Defendants contend that the Complaint does not sufficiently allege a misrepresentation or omission. For instance, Defendants claim that their false statements about possessing proper fishing licenses could not have been misleading because at the time Indonesia enacted a fishing ban. But, as Defendants acknowledge, the ban was merely temporary. By

trumpeting its valuable (but, in fact, non-existent) licenses, Defendants artificially inflated the price of Pingtan's stock because the market assumed that Pingtan could resume fishing once the ban was lifted. Accordingly, Defendants' argument misapprehends the nature of Plaintiff's claim. Likewise, Defendants argue that their misrepresentations regarding the Timor-Leste licenses were not material, but fail to support the argument with any suitable authority.

Finally, Defendants claim that they lacked scienter. This argument is not credible. Fishing in Indonesian waters was the source of the bulk of Pingtan's revenue. Furthermore, Defendants themselves acknowledged the importance of proper licensing to its operations, comparing maintaining current licensing to owning a taxicab fleet (*i.e.*, the value of a license is greater than the underlying vehicle). Because the license issue goes to the very heart of Pingtan's business, the core operations doctrine applies and Defendants should be presumed to have the requisite scienter. Moreover, Defendants repeatedly emphasized the Individual Defendants' deep knowledge of the fishing industry, especially in the case of Defendant Zhuo who is Pingtan's Founder, CEO and Chairman of the Board. The Individual Defendants also certified the materially false SEC filings under the Sarbanes-Oxley Act, which also raises an inference of scienter.

In sum, the Complaint lays out Defendants' securities fraud in extensive detail. The Court should deny Defendants' motion in its entirety.

## II.  SUMMARY OF THE ALLEGATIONS

Plaintiff alleges that Pingtan engaged in securities fraud during the proposed Class Period (March 9, 2016 through May 10, 2017). Pingtan is a China-based company whose stock is traded on NASDAQ.  ¶¶3, 74.[1]  Pingtan purports to engage in ocean fishing. ¶2.  Pingtan's

---

[1] All cites are to the Amended Complaint, unless otherwise indicated.

revenue depended heavily on its catches from Indonesian waters, particularly the Arafura Sea in Indonesia. ¶62. Throughout the Class Period, Pingtan claimed in its SEC filings and press releases that it was fully licensed to operate in Indonesian waters. ¶5. For instance, in its 2015 10-K form, which was signed by the Individual Defendants, Pingtan stated that "[a]mong [Pingtan's] 135 fishing vessels, 117 of these vessels are licensed to operate in the Arafura Sea in Indonesia but temporarily not operating due to [the Moratorium]. ¶32. The same 10-K stated: "[We] have a license to operate 117 of these vessels . . . in the Arafura Sea in Indonesia." ¶33. Pingtan made substantially similar representations in its 2016 Q1 Form 10-Q , 2016 Q2 Form 10-Q, 2016 Q3 Form 10-Q, and 2016 Form 10-K . ¶¶34-46. *In fact, Pingtan was never licensed by the government of Indonesia.* ¶¶6, 47.

Pingtan's fraud did not end there. Pingtan also misrepresented that it had obtained fishing licenses from the government of Timor-Leste to fish in Timorese waters. On August 4, 2016, Pingtan issued a press release announcing that thirteen of its vessels obtained fishing licenses from the Ministry of Agriculture and Fisheries of Timor-Leste, allowing them to operate in the sea areas of that country. ¶49. Pingtan repeated this claim in its 2016 Q2 10-Q and the 2016 Q3 10-Q. ¶50. In fact, Pingtan was never licensed to fish in Timor-Leste's waters; the pertinent licenses were issued to Hong Long, a different company controlled by Defendant Zhuo's wife, and never transferred to Pingtan. ¶51

On May 10, 2017, the investment research firm Aurelius Value published a report exposing Pingtan's lies about being licensed to fish in Indonesian and Timorese waters. ¶52. The report quoted Indonesian Minister of Marine Affairs and Fisheries as denying that Pingtan was ever licensed to fish in Indonesia. The Minister also stated that she would report Pingtan to NASDAQ for its false representations. ¶53. Another article cited by Aurelius Value stated that

the Indonesian fishing regulator intended to sue Pingtan for fishing illegally in Indonesian waters. With respect to Timor-Leste, the Aurelius Value report stated that Pingtan did not possess the necessary fishing licenses, and that the licenses were actually held by another company, Hong Long. ¶¶56-57. Notably, the report stated that Pingtan previously provided written assurance to Timor-Leste's Director of Fisheries that it "was not involved after the company last year issued a press release to investors boasting of new fishing rights in Timorese waters." ¶60.

The Aurelius Value report shocked the market. ¶61. On May 10, 2017, the price of Pingtan's stock collapsed by over 28%. ¶61. The market's reaction was understandable because Pingtan repeatedly emphasized the importance of maintaining proper licenses. For example, on May 11, 2017, Pingtan issued a press release stating: "The Company considers the value of its fleet relatively similar to the taxi medallion market where the value of the limited license is greater than the physical cost of the means of transportation." ¶63. The importance of the Indonesian license was particularly great because Pingtan derived a majority of its revenue from fishing in Indonesian waters. ¶62. Defendants finally acknowledged that they did not have a license to fish in Indonesian waters on March 14, 2018. ¶65.

## III. ARGUMENT

### A. Standard of Review

To survive a motion to dismiss, a plaintiff's request for relief need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). In assessing the sufficiency of a complaint, courts must "accept all factual allegations in the

complaint as true and must consider the complaint in its entirety." *Slayton v. American Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Courts must also draw "all reasonable inferences in the plaintiffs' favor." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), a plaintiff must allege: (1) "a material misrepresentation (or omission)"; (2) scienter, *i.e.*, a wrongful state of mind"; (3) "a connection with the purchase or sale of a security"; (4) "reliance"; (5) "economic loss"; and (6) "loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Here, Defendants only challenge the sufficiency of the Complaint with respect to three of these elements; loss causation, falsity, and scienter.

### B.      The Complaint Sufficiently Alleges Loss Causation

To plead loss causation, a plaintiff must simply "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc.*, 544 U.S. at 347. *See also In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 45-46 (D. Mass. 2006) (*Dura* "reaffirmed the notion that the loss causation pleading requirements should be interpreted so as not to impose a significant burden on plaintiffs"). Because "[l]oss causation is a fact-based inquiry," all reasonable inferences should be drawn in plaintiff's favor on a motion to dismiss. *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 174 (2d Cir. 2005).

Because loss causation is often a fact-intensive inquiry, it is generally inappropriate to rule on loss causation on a motion to dismiss. The Second Circuit has held that loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). Defendants' loss causation argument is more properly viewed as a "truth on the market"

affirmative defense. Under the "truth on the market" doctrine, information already well known to the market is immaterial, and therefore not actually false or misleading. *See*, *e.g*., *Hall v. The Children's Place Retail Stores, Inc*., 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008). To establish "a truth on the market" defense, however, Defendants must show that any corrective information was previously conveyed to the public "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information…" *Ganino*, 228 F.3d at 167. "The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Id*.

Indeed, courts are hesitant to adjudicate the truth on the market defense even at the summary judgment stage, let alone a motion to dismiss. *See*, *e.g*., *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996) (consideration of the defense "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.") (citation and quotation marks omitted); *Freeland v. Iridium World Commns., Ltd*., 545 F. Supp. 2d 59, 79 (D.D.C. 2008) ("Due to the fact-intensive nature of the truth-on-the-market defense, . . . its resolution is best left to the jury."); *In re Columbia Sec. Litig*., 155 F.R.D. 466, 482 (S.D.N.Y. 1994) ("Under [truth on the market defense], we would find defendants' burden of rebutting the presumption of reliance extremely difficult, perhaps impossible, to meet at the summary judgment stage.")

Here, at the very least, a question of fact exists, inappropriate for resolution on a Rule 12(b)(6) motion: whether the obscure articles in foreign newspapers constitute corrective disclosures. *Scott v. ZST Digital Networks, Inc.*, 2012 WL 538279, at *12 (C.D. Cal. Feb. 14, 2012) ("In light of the market's non-reaction to the previous article—a drop in the Company's

share price of one percent, according to Plaintiff—and its vigorous reaction to the publication of the April 21, 2011 article, the Court concludes that the issue is not appropriate for resolution at the pleading stage.").

*Scott* is especially instructive. There, the plaintiffs successfully pleaded a corrective disclosure based on the *later* short-seller report. 2012 WL 538279, at *11. The court, however, held that the earlier report did not "overcome" the plaintiff's pleading of loss causation, in large part due to a stock drop of over 40% that occurred on the day of the later report. *Id*. Similarly, here, Plaintiff does not allege any material fluctuation in the price of Pingtan's stock based on the purported early disclosures, but rather solely due to the publication of the Aurelius Value report.

Defendants rely on *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010) for the proposition that a negative characterization of previously disclosed facts cannot constitute a corrective disclosure. But *Omnicom* was decided on a motion for summary judgment, not a motion to dismiss. *Id*. at 504. A full factual record therefore existed in that case that allowed the court to determine that the corrective disclosure at issue was nothing more than a "negative characterization" of known facts. Here, the Court has not been presented with any meaningful evidentiary record and/or expert opinion, making such a determination improper. *Scott*, 2012 WL 538279, at *11 (loss causation adequately pled where defendants argued accounting discrepancies had been disclosed six months earlier than plaintiffs alleged).

Defendants' reliance on *Fila v. Pingtan Marine Enterprise Ltd.*, 195 F. Supp. 3d 489 (S.D.N.Y. 2016) is also misplaced. As an initial matter, this decision from a sister court is not binding upon this Court. The case is also factually distinguishable. In the *Fila* case, the plaintiff alleged that an independent analyst's "summar[y] and interpret[ation]" of the defendant's SEC

filings constituted a corrective disclosure.  *Id.*, at 497.  Of course, information disclosed in publicly available SEC filings is part of the overall "mix of information" regarding a company. That is not the situation here, however.  Defendants' claim of publicly available information rests in large part on articles in the Indonesian press, a press release from a Chinese Embassy, and a *Sydney Morning Herald* article.

Under these circumstances, Defendants cannot establish as a matter of law that these obscure foreign disclosures fully apprised the market of the fact that Pingtan misrepresented rightful ownership of the necessary fishing licenses.  Indeed, several courts have held that even in an efficient market, a company's stock price may not always immediately reflect all publicly available information. *See*, *e.g.*, *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008) (rejecting a "bright-line rule requiring an immediate market reaction" ); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 n.33 (5th Cir. 2009) ("a delayed reaction can still satisfy the pleading requirements for loss causation"); *In re Winstar Commn's*, 2006 WL 473885, *15 (S.D.N.Y. Feb. 27, 2006) (loss causation may be pled where "findings in [short seller] reports are not attributed to any non-public information").  Thus, loss causation may be alleged sufficiently when a later disclosure synthesizes previously public, but not widely available information.

In sum, the Aurelius Value report plainly impacted Pingtan's stock price, notwithstanding prior purported disclosures overseas – most of which were not even in English.  Specifically, Plaintiff alleges that the publication of the Aurelius Value report caused a major surprise in the market and an immediate collapse in Pingtan's stock price of over 28%. At the pleading stage, this is sufficient to allege a viable loss causation theory.  *See*, *e.g.*, *New Orleans Emps. Ret. Sys. v. Celestica, Inc*., 455 Fed.Appx. 10, 16 (2d Cir. 2011) (allegations of a "precipitous decrease in share price that occurred after [the issuer] disclosed the tru[th]" support an inference of

materiality at the motion to dismiss stage); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 520 (S.D.N.Y. 2013) ("At the motion to dismiss stage, allegation of sharply negative market reaction can be used to support other allegations of materiality.").

### C. The Complaint Alleges Material Misstatements and Omissions

#### 1. Material Misrepresentations and Omissions Concerning Pingtan's Fictional Indonesian Fishing Licenses

The Complaint alleges that throughout the Class Period Pingtan falsely represented that it was licensed by the government of Indonesian to fish in its waters.

Pingtan's principal argument relies heavily on the imposition of a temporary general fishing ban by the Indonesian government. Adopting a no-harm-no-foul approach, Pingtan argues that because it disclosed the existence of a temporary ban, its misrepresentations regarding possessing the requisite licenses were not sufficiently material to alter the "total mix" of available information. The obvious deficiency of this argument is that in analyzing potential return on investment, the market does not look solely at a company's current operations, but also (if not more importantly) at a company's future prospects. Pingtan concedes that the Indonesian fishing ban was merely temporary. By misrepresenting to investors that it was fully licensed to fish in Indonesian waters, Pingtan communicated that as soon as the temporary ban is withdrawn the company could resume its fishing operations there. This misrepresentation is especially important because revenue from Indonesian fishing was one of Pingtan's major sources of revenue. In other words, Plaintiff's argument is not that Pingtan misled by misrepresenting the current fishing situation, but rather by misrepresenting its future revenue prospects when the temporary ban would be lifted. Indeed, as the Aurelius Value report observed, Pingtan's shares "have recently surged by a factor of over 4x as management has fueled speculation that its fleet *will soon be redeployed* to generate windfall profits." Katze Decl., Exh. B at 6 (emphasis

added). Further, Individual Defendant Yu stated "we are confident that the operation in Indonesian waters will restore to normal in 2017." *Id.*, at 12. The fraud, thus, pertained to the possibility of future revenues, not the lack of current revenues due to the temporary fishing ban.

Pingtan also points out that it disclosed that it may obtain fishing licenses through third parties. That, however, does not excuse Pingtan's repeated misrepresentations that it itself held valid fishing licenses. At most, these purported disclosures give rise to a factual dispute concerning materiality that may not be resolved upon a motion to dismiss, without a complete evidentiary record and/or expert testimony.

Pingtan also argues that the Complaint's allegations contradict Plaintiff's allegations that the Company never had valid Indonesian fishing licenses. In fact, the sole allegedly contrary disclosure was made on March 14, 2018 (¶65), *nearly a year <u>after</u> the conclusion of the Class Period*. Of course, Pingtan may not use its subsequent grudging acknowledgement that its prior statements were false to avoid liability for the fraud committed during the Class Period. Pingtan's argument, therefore, is misleading.

In sum, Pingtan's materiality argument with respect to the Indonesian fishing licenses is without merit.

### 2. Material Misrepresentations and Omissions Concerning Pingtan's Non-Existent Timor-Leste Licenses

Pingtan does not – and cannot – dispute that it represented to investors that it obtained 13 fishing licenses from the Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste. Pingtan does not – and cannot – dispute that this representation was false, and that the company was never licensed by Timor-Leste.

Faced with these indisputable allegations, Pingtan resorts to a series of subterfuges. First, Pingtan argues that the misrepresentations do not matter because the fishing licenses were issued

to Hong Long, an entirely different company purportedly owned by Defendant Zhuo's wife, and that Pingtan disclosed that it acquired certain fishing vessels from that company. This purported disclosure, however, does nothing to cure the fact that Pingtan stated falsely that it itself was licensed to fish in Timorese waters. Indeed, Pingtan's argument is akin to an assertion that if an adult with a driving license gives the car keys to his or her child, then the minor is implicitly licensed to operate the vehicle. In any event, Pingtan itself assured the Timorese government that Pingtan had no involvement with those Hong Long vessels that obtained the Timorese fishing licenses.

Second, Pingtan argues that its public filings "do not state or even imply that the government of Timor-Leste issued licenses directly to Pingtan." The very next sentence of Pingtan's brief belies that argument: "Pingtan clearly states that '13 vessels have obtained fishing licenses' from Timor-Leste." The common meaning of "obtain" is "to get something"[2] Of course, a synonym of "to get something" is "to receive," as in "to receive a fishing license." Because Pingtan's statement is at least misleading, if not outright false, Pingtan's obfuscation on this point is unpersuasive.

Third, Pingtan argues that its 2016 press releases cured the effect of its earlier misstatements concerning being licensed by Timor. These press releases do no such thing, but rather reinforce the material misstatements. For example, Pingtan's 2015 10-K form states only that it purchased fishing vessels with Hong Long and intended to register them in its name. Katze Decl., Exh. C at 3-4. This statement creates a misleading impression that Hong Long had a legal right to transfer its fishing licenses to Pingtan, and that the Company intended to operate under those licenses. Similarly, Pingtan's August 4, 2016 press release states that vessels

---

[2] https://dictionary.cambridge.org/us/dictionary/english/obtain (accessed on September 6, 2018).

"controlled" by the Company had fishing licenses, thus creating a false impression that Pingtan was in fact the license holder, not Hong Long. In other words, Pingtan's public statements obfuscate more than they reveal.

Fourth, Pingtan asserts that the *Sydney Morning Herald* article does not contradict the allegation that Pingtan assured Timorese government that it had nothing to do with the licensed vessels.[3] But although the article mentions that Pingtan was purporting to operate under Hong Long's license, Timorese government steadfastly denied that it had authority to fish in its waters. Katze Decl., Exh. J at 6 (reporting that the Timorese government obtained "a written assurance Pingtan was not involved after the company last year issued a press release to investors boasting of new fishing rights in Timorese waters.") At the very least, Pingtan's written assurance suggests that it was either (1) deceiving Timorese government by claiming that it was not fishing in its waters, or (2) Pingtan was not fishing there, despite representing to investors that it had a license to do so. There is nothing inconsistent in Plaintiff's allegations.

Finally, Pingtan contends, without citing any authority, that its alleged misstatements and omissions were not material. But materiality is a highly fact-specific inquiry. Considering that this issue involves an analysis of the relative permissibility of a Chinese company fishing in Timor-Leste's waters under a license purportedly granted to a third party Chinese company, and the legal implication thereof under local law, the Court should adjudicate it with the benefit of a

---

[3] Pingtan claims that it had no duty to disclose that the Timorese fishing licenses actually were issued to Hong Long. But Pingtan had *affirmatively* broached the topic of the licenses – and, in fact, *affirmatively* (mis-)represented that it received such licenses. Under these circumstances, Pingtan had a duty to disclose all material information. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1331 (2015) (defendant may not "mislead[] investors by saying one thing and holding back another"). .

complete evidentiary record.[4]

### D.    The Complaint Sufficiently Alleges Scienter

The PSLRA requires Section 10(b) claimants to allege facts that, viewed holistically, give rise to a strong inference of scienter. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322-23 (2011). The Supreme Court mandates that each fact bearing on scienter be weighed collectively. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Allegations giving rise to a strong inference of scienter may include allegations that the defendants (1) benefited in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting their public statements were not accurate, or (4) failed to check information they had a duty to monitor. *Novak v. Kasaks*, 216 F.3d 300, 307-09, 311 (2d Cir. 2000); *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2nd Cir. 2009). If the inference of scienter is equally as compelling as any innocent inference, the motion to dismiss must be denied. *ACA Find. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008). Recklessness is a sufficiently culpable mental state for securities fraud. *Id.* at 198.

Pingtan emphasizes that the Individual Defendants did not have an express motive to artificially inflate the price of stock and did not sell stock at inflated prices during the Class Period. The Supreme Court has rejected that contention. *Tellabs*, 551 U.S. at 325 (rejecting the argument scienter was negated because the plaintiff "did not allege that [the defendant] sold any shares during the class period").

In any event, there is extensive evidence of scienter. Defendants were well aware of the importance of fishing licenses. Indeed, they compared having these licenses to having taxi

---

[4] Notably, Pingtan's claim that it was properly operating under Hong Long's license contradicts its representations to the Timorese government, as cited in the *Sydney Morning Herald.*

medallions in that the value of the license exceeds the cost of the underlying fishing vessels.  Not only were licenses critical to Pingtan's operations, but the Company confirmed that it derives a majority of its revenue from fishing in the Indonesian waters.  Pingtan's argument that its top executives were ignorant of the license issue is simply not credible.  In fact, if the Individual Defendants were not aware that the Company lacked essential licenses, that in itself is evidence of utter recklessness.

Given the importance of fishing licenses to Pingtan's business, this case easily falls within the scope of the "core operations" doctrine.  In the traditional case involving such "core operations," a particular operation is so crucial to the issuer that it would be "absurd to suggest" that defendants did not have knowledge of it. *In re Countrywide Financial Corp Sec. Litig*., 588 F. Supp. 2d 1132, 1189 (C.D. Cal. 2008).  *See also In re Winstar*, 2006 WL 473885, at *7 ("High level corporate officers who signed the SEC filings … have a duty to familiarize themselves with the facts relevant to the core operations of the company and the financial reporting of those operations. Such officers may not ignore reasonably available data that would indicate that the statements they issued … were materially false or misleading"); *In re Am. Bank Note Holographics, Inc. Sec. Litig*., 93 F. Supp. 2d 424, 426-27 (S.D.N.Y. 2000) (in addition to several years of significantly false financial figures, access to company's "actual sales and revenue information by virtue of their positions … combine to raise a strong inference that [the company's CEO and CFO] engaged in conduct that was either conscious or reckless"); *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (directors presumed to know about a company's core operations).

"Core operations include [*inter alia*] events affecting a significant source of income." *In re Hi-Crush Partners L.P. Sec. Litig*., 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013).  Here,

Defendants themselves acknowledged that a majority of Pingtan's revenue was derived from fishing in Indonesian waters. Defendants further acknowledged the importance of maintaining all appropriate fishing licenses. The core operations doctrine, therefore, provides a strong inference of scienter.[5]

Further, Plaintiff alleges that the Individual Defendants knowingly misrepresented the Company's license status in Pingtan's SEC filings, in which they declared pursuant to the Sarbanes-Oxley Act that the statements contained therein were accurate. False Sarbanes-Oxley certifications are evidence of scienter. *See In re Silver Wheaton Corp. Secs. Litig.*, CV15-5146-CAS(JEMx), 2016 WL 3226004, at *12 n. 9 (C.D. Cal. June 6, 2016) (SOX certifications, along with other factual allegations, raised an inference of scienter); *Glazer Capital Mgmt., LP. v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008) (specific factual allegations indicating that defendants were severely reckless in executing SOX certifications may be probative of a strong inference of scienter). By falsely certifying that the Company had the necessary fishing licenses, the Individual Defendants "did not fairly present a complete picture of [its] financial condition." *City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 419-20 (D. Del. 2009). Their failure to do so in contravention of their corporate duty is indicative of scienter. Considering that these false certifications pertain directly to the core issue in this litigation (the Company's possession of fishing licenses), a strong inference arises of the Individual Defendants' fraudulent intent or, at best, recklessness.

---

[5] Moreover, core operations allegations are particularly persuasive when combined with allegations, as here, that the defendants had access to information contrary to their public representations. *See Fairway*, 2015 WL 249508, at *15 (holding that "access to facts contradicting defendants' positive public statements supports an inference of scienter" when the company's "capacity for growth and sales volume ... were contradicted by deficient infrastructure and actual sales data" and "defendants' misstatements concerned a core operation of their company, as [the company's] ability to support growth was a key selling point emphasized on the IPO roadshow and in earnings calls with investors").

Moreover, with respect to Timor-Leste, Plaintiff alleges that that country's Director of Fisheries stated to the *Sydney Morning Herald* that he sought and received written assurance from Pingtan that the Company would not fish in Timorese waters. ¶60. It is highly unlikely that the Company would issue such a statement without knowledge and approval of its top executives.

Furthermore, Defendants themselves emphasized the Individual Defendants' close familiarity with the Company's operations. Defendant Zhuo is Pingtan's founder, CEO, and Chairman of the Board. ¶66. Pingtan's 2016 10-K stated "We depend significantly on our Chief Executive Officer" and "Mr. Zhuo . . . has overseen out operations since inception, is the director most familiar with our business and industry, and is best positioned to set and execute strategic priorities." *Id.* Given these unambiguous pronouncements, Defendants' belated denial of scienter rings hollow.

Defendants argue that the Individual Defendants' high-ranking positions (CEO and CFO) do not inherently indicate scienter. But Plaintiff is not relying solely on the Individual Defendants' job duties. Rather, Plaintiff contends that the Individual Defendants' positions support an inference of scienter when considered holistically, along with the core operations doctrine, as well as numerous other indicia of scienter.

Pingtan's authority is inapposite. *Cox v. Blackberry Ltd.*, 660 Fed. Appx. 23 (2d Cir. 2016) is an unpublished, and thus unciteable, summary order. Moreover, *Cox* involved a classic "fraud by hindsight" claim. *Id.*, at 25. The plaintiffs in *Cox* did not allege ***any*** facts supporting their claim that Blackberry's top executives were aware of the higher-than-expected rate of returns for one of the company's many products. Here, by contrast, Plaintiff has alleged that the

issue of proper licensing lies at the heart of Pingtan's business and concerned the Company's principal source of revenue.[6]

Also, even if Plaintiff has not sufficiently alleged the Individual Defendants' scienter (and she has), she adequately pled scienter as to Pingtan itself, because its lower-ranked employees' knowledge regarding the illusory and fictitious licenses can be imputed to the Company. To allege that a corporation has acted with scienter, a plaintiff must plead facts that "create a strong inference that someone whose intent could be imputed to [the Company] acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "[T]he most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." *Id.* "But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id.* Here, even assuming that the Individual Defendants lacked knowledge about the crucial issue of the Company possessing the necessary licenses (as implausible as that may be), surely lower ranked employees possessed such knowledge. Their knowledge may therefore be imputed to Pingtan itself.

In sum, considering all the foregoing allegations holistically, the culpable explanation of Defendants' false and misleading statements regarding maintaining active fishing licenses is at least as compelling as any nonculpable alternatives. *See Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 620 n.14 (S.D.N.Y. 2008) ("[Under *Tellabs*,] if an inference of non-fraudulent intent is equally permissible as any inference of fraudulent intent, the complaint is properly pleaded."). In fact, Defendants have not presented any nonculpable alternative. Nor

---

[6] In any event, the Second Circuit in Cox reversed the district court's denial of leave to amend. *Id*. at 26. Should the Court find the present scienter allegations to be lacking, Plaintiff respectfully requests leave to amend.

would it be possible to square such an inference with the Complaint's particularized allegations of Defendants' knowledge or reckless disregard of facts known to them. Indeed, even if Defendants believed they could eventually secure the proper licenses, "[t]he fact that a gamble--concealing bad news in the hope that it will be overtaken by good news--fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing." *Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 710 (7th Cir. 2008).

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Pingtan's motion to dismiss in its entirety.   Should the Court find merit in any of Pingtan's arguments, Plaintiffs respectfully request leave to amend.   Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." *See also Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (noting with regard to dismissal of plaintiffs' 10b-5 claims that "[c]omplaints dismissed under Rule 9(b) for [failure to plead fraud with particularity] are 'almost always dismissed with leave to amend'").

Dated: September 13, 2018                 Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Robert V. Prongay*
Robert V. Prongay
Lionel Z. Glancy
Stan Karas
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (301) 201-9150
Fax: (301) 201-9160
Email: lglancy@glancylaw.com
        rprongay@glancylaw.com
        skaras@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lesley Frank Portnoy
230 Park Avenue
Suite 530
New York, NY 10169
212-682-5340
Fax: 212-884-0988
Email: lportnoy@glancylaw.com

*Counsel for Lead Plaintiff*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On September 13, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Eastern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 13, 2018.


*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 1:17-cv-03807-DLI-ST Zheng v. Pingtan Marine Enterprise Ltd. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ronald G. Blum**
  rblum@manatt.com,astaltari@manatt.com

- **Stan Karas**
  skaras@glancylaw.com

- **Samantha Jill Katze**
  skatze@manatt.com,astaltari@manatt.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Yuri Mikulka**
  ymikulka@manatt.com,jadair@manatt.com

- **Lesley Frank Portnoy**
  lportnoy@glancylaw.com

- **Robert Prongay**
  rprongay@glancylaw.com,info@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)