UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ZHONG ZHENG, individually and on behalf of all :
others similarly situated, :
:
Plaintiffs, :
: **OPINION & ORDER**
-against- : 17-CV-3807 (DLI) (VMS)
:
PINGTAN MARINE ENTERPRISE LTD., :
XINRONG ZHUO, AND ROY YU, :
:
Defendants. :
-----------------------------------------------------------------x
**DORA L. IRIZARRY, Chief United States District Judge:**

Plaintiff Zhong Zheng ("Plaintiff") brings this proposed securities class action based on a May 10, 2017 article published on a website www.aureliusvalue.com entitled, "Pingtan Marine: A Fraud That Finances Human Trafficking and Poaching" (the "Aurelius Article"), which allegedly caused a twenty-eight percent drop in the stock price of Defendant Pingtan Marine Enterprises Ltd. ("Pingtan"). Plaintiff claims to have purchased Pingtan's securities during the putative class period and seeks certification of a purported class. Plaintiff now seeks relief under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and § 78t(a)) and Rule 10b-5 against Defendant Xinrong Zhuo, Pingtan's Founder, and Defendant Roy Yu, Pingtan's Chief Financial Officer (collectively, the "Individual Defendants") during the putative class period and Defendant Pingtan (collectively, "Defendants").

On May 29, 2018, Plaintiff filed an amended complaint. Amended Complaint ("Am. Compl."), Docket Entry No. 20. On July 20, 2018, Defendants filed a motion to dismiss pursuant to 12(b)(6) and accompanying memorandum of law. (Motion to Dismiss, Docket Entry No. 26; Memorandum of Law in Support ("Defs.' Mem."), Docket Entry No. 27.) Plaintiff opposed the motion. (Plaintiff's Opposition to Defendants' Motion to Dismiss ("Pl.'s Opp'n"), Docket Entry

No. 31.) Defendants replied to Plaintiffs' opposition. (Reply to Plaintiffs' Opposition ("Defs.' Reply"), Docket Entry No. 32.)

For the following reasons set forth below, Defendants' motion is granted.

## **BACKGROUND**

This proposed securities class action is based on the May 10, 2017 Aurelius Article, which Plaintiff alleges caused a 28% drop in Pingtan's stock price. (Am. Compl. ¶¶ 9-10.) Plaintiff claims to have purchased Pingtan's securities during the putative class period of March 9, 2016 through May 10, 2017 and seeks certification of the purported class. (Am. Compl. ¶¶ 1-10.)

Defendant Pingtan is a Cayman Islands exempted limited liability company with its principal business and material operations in the People's Republic of China and traded on the NASDAQ stock exchange. (Excerpts from Pingtan's 2016 Q3 Form 10-Q ("2016 Q3 10-Q"), Katze Decl. Ex. F, Docket Entry No. 30-6, at 5; *See also*, Am. Compl. ¶ 16.) Pingtan is a marine enterprises company that primarily engages in ocean fishing through its operating subsidiary, Fujian Provincial Pingtan County Ocean Fishing Group Co. ("Pingtan Fishing"). (2016 Q3 10-Q at 27; *See also*, Am. Compl. ¶ 16.) Defendant Xinrong Zhuo, Pingtan's Founder, was Chief Executive Officer and Chairman of the Board of Directors, and Defendant Roy Yu was Pingtan's Chief Financial Officer during the putative class period. (Am. Compl. ¶¶ 17-18).

## I.    The Alleged Securities Laws Violations

### A.    Alleged Fraudulent Statements and Omissions

Plaintiff alleges that Pingtan deceived investors by making materially false or misleading statements or omissions. Specifically, Plaintiff alleges that Pingtan made "misrepresentations about being licensed to fish in Indonesian waters" and "misrepresented that it had obtained fishing

licenses from the government of Timor-Leste to fish in Timorese waters."[1]  (Am. Compl. ¶ 48.)
According to Plaintiff, these statements were false and misleading because Pingtan and Pingtan's
vessels never were licensed to fish in Indonesian waters.  (Am. Compl. ¶¶ 49-51.)

The amended complaint identifies five public filings allegedly containing false and
misleading statements concerning Pingtan's license to fish in Indonesian waters:

(1) Pingtan's 10-K for 2015 ("2015 10-K"):

> Among [Pingtan's] 135 fishing vessels, 117 of these vessels are
> licensed to operate in the Arafura Sea in Indonesia but temporarily
> not operating due to [the Moratorium]" and "[w]e currently operate
> 135 fishing vessels and have a license to operate 117 of these vessels
> operate (sic) in the Arafura Sea of Indonesia.

(Am. Compl. ¶¶ 30-32; Excerpts from Pingtan's 2016 10-K ("2015 10-K"), Katze Decl., Ex. C,

Docket Entry No. 34-3.)

(2) Pingtan's 10-Q for the first quarter of 2016 ("2016 Q1 10-Q"):

> Among [Pingtan's] 135 fishing vessels, 117 of these vessels are
> licensed to operate in the Arafura Sea in Indonesia but temporarily
> not operating due to the [Moratorium].

(Am. Compl. ¶¶ 34-36; Excerpts from Pingtan's 2016 Q1 Form 10-Q ("2016 Q1 10-Q"), Katze

Decl., Ex. D, Docket Entry No. 34-4.)

(3) Pingtan's 10-Q for the second quarter of 2016 ("2016 Q2 10-Q"):[2]

> As of June 30, 2016, we own 107 trawlers, 4 longline fishing
> vessels, 2 squid jigging vessels and 2 drifters and have exclusive
> operating license rights to 20 drifters. . . . These vessels are fully
> licensed to fish in Indonesian, Indian, or Western and Central Pacific
> Ocean of the International waters.

---

[1]     Plaintiff further alleges that these public filings were signed by the Individual Defendants and
contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of
financial reporting, the disclosure of any material changes to Pingtan's internal controls over financial
reporting, and the disclosure of all fraud. (Am. Compl. ¶¶ 30-31, 34- 35, 37-38, 40-41, 43-44.)  However,
Plaintiff does not allege violations of SOX in her amended complaint.

[2]     Plaintiff incorrectly alleges in the amended complaint that Pingtan's 2016 Q2 10-Q was filed with
the SEC on May 8, 2016.  (Am. Compl. ¶ 37.)

(Am. Compl. ¶¶ 37-39; Excerpts from Pingtan's 2016 Q2 Form 10-Q ("2016 Q2 10-Q"), Katze

Decl., Ex. E, Docket Entry No. 34-5.)

      (4) <u>Pingtan's 10-Q for the third quarter of 2016 ("2016 Q3 10-Q")</u>:[3]

> As of September 30, 2016, we own 107 trawlers, 4 longline fishing
> vessels, 2 squid jigging vessels and 2 drifters and have exclusive
> operating license rights to 20 drifters. . . . These vessels are fully
> licensed to fish in Indonesian, Indian, or Western and Central Pacific
> Ocean of the international waters

(Am. Compl. ¶¶ 40-42; Excerpts from Pingtan's 2016 Q3 Form 10-Q ("2016 Q3 10-Q"), Katze

Decl., Ex. F, Docket Entry No. 34-6.)

      (5) <u>Pingtan's 10-K for 2016 ("2016 10-K")</u>:

> Among [Pingtan's] 135 fishing vessels, 13 are operating in Indo-
> Pacific waters; 12 are operating in the Bay of Bengal in India; 2 are
> operating in international waters of Southwest Atlantic and
> Southeast Pacific Oceans; 4 will be operating in international waters
> of Pacific Ocean upon completion of paperwork formalities, and the
> remaining vessels are licensed to operate in the Arafura Sea in
> Indonesia but temporarily not operating due to the moratorium
> discussed below. . . . [and that] [w]e currently operate 135 fishing
> vessels and have a license to operate 104 of these vessels operate
> (sic) in the Arafura Sea of Indonesia.

(Am. Compl. ¶¶ 43-46; Excerpts from Pingtan's 2016 Form 10-K ("2016 10-K"), Katze Decl., Ex.

G, Docket Entry No. 34-7.)

      Plaintiff also alleges Pingtan made misleading representations in a press release concerning

Pingtan's licenses to fish in Timor-Leste. Specifically, Plaintiff alleges that, on August 4, 2016,

Pingtan issued a press release "announc[ing] that thirteen of its vessels ha[d] obtained fishing

licenses from the Ministry of Agriculture and Fisheries of Timor-Leste, allowing them to operate

in the sea areas of Timor-Leste." (Am. Compl. ¶¶ 48-49.)

---

[3]     Paragraph 40 of the amended complaint incorrectly refers to the second quarter of 2016 instead of the third quarter.

Relatedly, Plaintiff also identifies a statement in two of Pingtan's public filings that supposedly repeat the statement in the press release. Plaintiff alleges that Pingtan's 2016 Q2 and Q3 10-Q and stated: "Among [Pingtan's] 135 fishing vessels, 13 vessels have obtained fishing licenses from the Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste and will operate in the sea area of Democratic Republic of Timor-Leste." (Am. Compl. ¶¶ 50-51.) According to Plaintiff, these statements were false and misleading because the Timorese fishing licenses were not issued to Pingtan, but to Hong Long, "a different company that is owned and controlled by Defendant Zhuo's wife." (Am. Compl. ¶ 51.)

Plaintiff alleges that the Aurelius Article reveals Pingtan's fraud. (Am. Compl. ¶¶ 9, 52-53.) The Aurelius Article questions Pingtan's value and expresses the opinion that Pingtan "ha[d] engaged in fraudulent activities that conceal[ed] the reality that its shares likely have zero value." (Aurelius Article, Katze Decl., Ex. B, at 26.) Plaintiff contends that Pingtan's stock price dropped twenty-eight percent after the Aurelius Article was published. (Am. Compl. ¶ 61.)

### B. Allegations Regarding Scienter

Plaintiff alleges that the scienter of the Individual Defendants, unidentified Pingtan employees, and agents should be imputed to Pingtan. (Am. Compl. ¶ 22) Specifically, Plaintiff alleges that Zhuo and Yu: (1) "directly participated in the management of" Pingtan; (2) were "directly involved in the day-to-day operation of [Pingtan] at the highest levels"; (3) were "privy to confidential proprietary information concerning [Pingtan] and its business and operations"; (4) were "directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged" in the amended complaint; (5) were "directly or indirectly involved in the oversight or implementation of [Pingtan's] internal controls"; and (6) were "aware of or recklessly disregarded the fact that the false and misleading

statements were being issued concerning [Pingtan]." (Am. Compl. ¶ 19) Plaintiff also alleges that Zhuo is "intimately involved in all aspects of Pingtan's operations" and that Yu led other "fraudulent Chinese companies listed in U.S." (Am. Compl. ¶¶ 66, 67.)

## II. Pingtan's Public Disclosures

Defendants, in the declaration of their attorney, Samantha J. Katze, (the "Katze Declaration," Docket Entry No. 34), list a number of statements in Pingtan's public filings to demonstrate that Pingtan disclosed that it relies on third parties to obtain fishing licenses. Pingtan's 2016 10-K states that "[t]he growth of [Pingtan's] business depends on [its] ability to secure fishing licenses directly or through third parties." (2016 10-K at 7.) Pingtan's public filings also make a number of statements about its fishing operations in both Indonesia and Timor-Leste.

### A. Fishing Operations in Indonesia

Defendants proffer a number of statements in Pingtan's public filings disclosing its fishing operations in Indonesia. *See generally*, Katze Decl. Pingtan stated in its 2015 and 2016 10-Ks, and its 2016 Q1 10-Q that "PT. Avona Mina Lestari and PT. Dwikarya Reska Abadi act as Pingtan Fishing's agents to apply and renew Indonesia fishing licenses and Pingtan Fishing pays the agent service fees to them." (2015 10-K at F-22; 2016 10-K at F-22; *See also*, Q2 10-Q at 20.)

Pingtan further proffers a number of statements to show that it disclosed that: (1) in February 2015, Pingtan stopped operating in Indonesian waters; (2) because Pingtan derived a majority of its revenue from fishing in Indonesian waters, the suspension of fishing operations in Indonesia had, and would continue to have, a significant negative impact on Pingtan; and (3) Pingtan's fishing operations in Indonesia continued to be suspended. These statements are set forth below.

(1) <u>2015 10-K</u>:  Under the heading, "Significant factors affecting our results of operations,"

Pingtan disclosed:

> Since February 2015, we have temporarily ceased operations in the Indonesian waters. Since we derive a majority of our revenue from this area, this temporary ban has caused a significant drop in our production. As a result, our sales for the year ended December 31, 2015 decreased significantly as compared to the year ended December 31, 2014.

(2015 10-K at 33.)  The 2015 10-K also stated that:

> 117 of the Company's 135 vessels were operating in Indonesian waters and significant portion of revenue was derived from them. Suspension of fishing operation in Indonesian waters has had and will continue to have a significant negative impact on the Company.

(2015 10-K at F-17.)

(2) <u>2016 Q1 10-Q</u>:

> 117 of the Company's 135 vessels were operating in Indonesian waters and significant portion of revenue was derived from them. Suspension of fishing operating in Indonesian waters has had and will continue to have a significant negative impact on the Company.

(2016 Q1 10-Q at 14.)

(3) <u>2016 Q2 10-Q</u>:

> We derive majority of our revenue from Indonesian waters, the suspension of fishing operation in this area has had and will continue to have significant negative impact on the Company.

(2016 Q2 10-Q.)

(4) <u>2016 Q3 10-Q</u>:

> As the Company has historically derived the majority of its revenue from Indonesian waters, the suspension of fishing operation in this area has had and will continue to have a significant negative impact on the Company.

(2016 Q3 10-Q at 14.)

(5) <u>2016 10-K</u>: Pingtan stated on page 2 of the document that:

> From February 2015, we temporarily ceased operations in the
> Indonesian waters. Since we derive a majority of our revenue from
> this area, this temporary ban has caused a significant drop in our
> production.

(2016 10-K at 2.)  In addition, Pingtan stated that:

> As the Company has historically derived the majority of its revenue
> from Indonesian waters, the suspension of fishing operation in this
> area has had and will continue to have a significant negative impact
> on the Company.

(2016 10-K at F-16.)

**B.     Fishing Operations in Timor-Leste**

Defendants also proffer a number of public filings as evidence Pingtan disclosed that it

obtained fishing licenses through Hong Long, a related third party, and that Timorese licenses it

used were issued to Pingtan-controlled vessels.

In Pingtan's August 4, 2016 press release entitled, "Pingtan Marine Enterprise has Access

to Fishing Licenses from Timor-Leste Company Controlled Vessels Expected to Operate in Timor-

Leste" (the "August 4, 2016 Press Release"), Pintgan stated that "thirteen fishing vessels

controlled by the [c]ompany have obtained fishing licenses from the Ministry of Agriculture and

Fisheries of Democratic Republic of Timor-Leste.  (August 4, 2016 Press Release, Katze Decl.,

Ex. H, Docket Entry No.  at 1.)

Pingtan made a similar statement in its August 5, 2016 8-K, in which it stated:

> On August 4, 2016, Pingtan Marine Enterprise Ltd. (Nasdaq: PME)
> (the "Company") issued a press release to announce that thirteen
> fishing vessels controlled by the Company have obtained fishing
> licenses from the Ministry of Agriculture and Fisheries of
> Democratic Republic of Timor-Leste and are expected to operate in
> the sea area of Democratic Republic of Timor-Leste.

(August 5, 2016 8-K, Katze Decl., Ex. I, Docket Entry No. 34-9, at 2.)

In its 2015 and 2016 10-Ks, Pingtan disclosed the relationship between Hong Long and Pingtan, explaining that Pingtan acquired 46 boats from Hong Long in June 2013 and that, while registrations for all boats had not yet been transferred, Pingtan fully owned and had full operating rights to the vessels.[4] (2015 10-K at 8; 2016 10-K at 5.)

Pingtan's 2015 and 2016 10-K describes Pingtan's relationship with Hong Long in that "[t]he major shareholder of Hong Long is Ms. Ping Lin, spouse of Xinrong Zhuo, the Company's Chairman and CEO, who holds 66.5% of Hong Long." (2015 10-K at 8, 2016 10-K at 5.) The 2015 10-K further stated that "Hong Long is an affiliate company majority owned and controlled by Ping Lin, spouse of [Pingtan's] CEO" and "Hong Long act[s] as [an] agent[] to apply fishing licenses for [Pingtan] and pay the related fishing license application fees on behalf of [Pingtan]." (2015 10-K at F-22.) Moreover, Pintan's 2016 Q1, Q2, and Q3 10-Qs identifies Hong Long as a "related party." (2016 Q1 10-Q at 26; 2016 Q2 10-Q at 26; 2016 Q3 10-Q at 27.)

The 2016 Q2 and Q3 10-Qs state that "13 vessels have obtained fishing licenses from the Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste," (2016 Q1 10-Q at 26; 2016 Q2 10-Q at 27), not that Pingtan obtained the licenses.

---

[4]      In its 2015 and 2016 10-Ks, Pingtan stated in pertinent text:
> On June 19, 2013, the Company entered into a master agreement ("Master Agreement") with a related party, Fuzhou Honglong Ocean Fishery Co., Ltd ("Hong Long") to acquire 46 fishing vessels with total consideration of $410.1 million. . . . Since June 2013, the Company has had full ownership of the vessels and the full right to operate the vessels and is in the process of registering the vessels under the name of the Company's PRC operating company. Currently, 20 of the 46 vessels are formally registered to the Company. The vessels are in the process of being registered under the name of the Company's PRC operating company and it will obtain the entire title registration document for the vessels, as required by Chinese laws and regulations according to the terms of the Master Agreement.

(2015 10-K at 8; 2016 10-K at 5.)

## III.    Procedural Posture

The amended complaint alleges (1) violations of § 10(b) of the Exchange Act and Rule 10b-5 against all Defendants and (2) violations of Section 20(a) of the Exchange Act against Zhuo and Yu.  Defendants now bring the instant motion to dismiss pursuant to 12(b)(6) contending that Plaintiff has failed to sufficiently plead (1) loss causation under § 10(b), (2) a misrepresentation or omission made by Defendants made with respect to its use of fishing licenses in Indonesia and Timor-Leste, and (3) Defendants' scienter for the alleged fraud.

## DISCUSSION

## I.    Legal Standard

### A.    Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim of relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (citations and internal quotation marks omitted).  The plausibility standard "does not require 'detailed factual allegations,' but it demands more than [] unadorned, the-defendant-unlawfully-harmed-me accusation[s]."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). *Iqbal* requires more than "'a formulaic recitation of the elements of a cause of action.'"  *Id.* at 681 (quoting *Twombly*, 550 U.S. at 555).  Where a complaint pleads facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).  On a motion to dismiss, the court accepts as true all well pled factual allegations and draws all reasonable inferences in the plaintiff's favor.  *LaFaro v. New York Cardiothoracic Grp., PLLC*, F.3d 471, 475 (2d Cir. 2009) (citations and internal quotation marks omitted).

## B. Securities Fraud Pleadings

A complaint alleging securities fraud under Section 10(b) of the Exchange Act is subject to two heightened pleading standards. First, the complaint must satisfy Rule 9(b) of the Federal Rules of Civil Procedure, which requires that the complaint "state with particularity the circumstances constituting the fraud." Fed. R. Civ. P. 9(b); *See also*, *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F. 3d 87, 99 (2d Cir. 2015) ("*ATSI*"). Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

## C. Section 10(b) Claims

Section 10(b) of the Exchange Act makes it illegal "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated thereunder, makes it unlawful for "any person, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To state a claim for relief under § 10(b) and Rule 10b-5, a plaintiff "must plead six elements: "(1) the defendant made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *IBEW Local Union No.*

*58 Pension Fund & Annuity Fund v. Royal Bank of Scotland Group, PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008)).

### 1. *Material Misrepresentation or Omission*

A plaintiff may bring a claim under § 10(b) and Rule 10b-5 based on either affirmative misstatements or omissions of material facts. "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). A claim based on omissions must allege that "the corporation is subject to a duty to disclose the omitted facts." *In re Optionable Sec. Litig.*, 577 F. Supp.2d 681, 692 (S.D.N.Y. 2008) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F. 3d 259, 267 (2d Cir. 1993)).

Additionally, the alleged misstatements or omissions must have been material. "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F. 3d 154, 161 (2d Cir. 2000). "Because materiality is a mixed question of law and fact, in the context of a Rule 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F. 3d 187, 197 (2d Cir. 2009) (internal quotation marks omitted).

### 2. *Scienter*

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F. 3d 98, 108 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007)) (internal quotation marks omitted). A plaintiff may establish an inference of scienter in a claim filed under Section 10(b) or Rule 10b-5 by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F. 3d at 99. To allege "motive and opportunity" to defraud, a complaint must allege facts showing that the defendants "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F. 3d at 307-08.

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F. 3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted). "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior." *Novak*, 216 F. 3d at 308. "Strong circumstantial evidence of reckless conduct also gives rise to an inference of scienter, so long as the complaint alleges 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re General Electric Co. Sec. Litig.*, 857 F. Supp. 2d 367, 393 (S.D.N.Y. Jan. 11, 2012) (quoting *Kalnit*, 264 F.3d at 142). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142 (citations omitted).

Under the heightened pleading requirements of the PLSRA, plaintiffs must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required

state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the

Supreme Court instructed courts to engage in a three-step analysis when evaluating scienter:

> *First* . . ., courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true . . . .  *Second*, courts must consider the complaint in its entirety, as well as sources courts ordinarily examine when ruling on a Rule 12(b)(6) motion to dismiss . . . .  The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard . . . .  *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences . . . .  The strength of an inference cannot be decided in a vacuum.  The inquiry is inherently comparative:  How likely is it that one conclusion, as compared with others, follows from the underlying facts?

*Tellabs*, 551 U.S. at 322-23 (emphases in original).

## D.      Section 20(a) Claims

To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary

violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that

the defendant was, in some meaningful sense, a culpable participant in the controlled person's

fraud."  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d

Cir.2014) (internal quotation marks and citations omitted).  Thus, "if a plaintiff has not adequately

alleged a primary violation, *i.e.*, a viable claim under another provision of the Exchange Act, then

the § 20(a) claims must be dismissed."  *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12,

22-23 (S.D.N.Y. 2016).

## II.      Plaintiff's 10(b) Claims

### A.      Plaintiff Fails to Establish Loss Causation

"To plead loss causation, a plaintiff must plausibly allege 'that the *subject* of the fraudulent

statement or omission was the cause of the actual loss suffered, *i.e.,* that the misstatement or

omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" *Central States, Southeast & Southwest Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 74 (2d Cir. 2013) (citing *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010) ("*Omnicom*")). However, "third-party articles and reports express[ing] negative opinions . . . based on information that was already publicly available . . . . are not 'corrective' for the purpose of pleading loss causation." *Id.* at 75. Accordingly, "[a] negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d at 512.

Defendants contend that Plaintiff fails to establish loss causation because Plaintiff's reliance on the Aurelius Article to support Plaintiff's 10b-5 claim is misplaced. (Defs.' Reply at 1.) Defendants contend the article is based on publicly available information and therefore, cannot constitute a corrective disclosure. *Id.*

Plaintiff counters that, at the very least, a question of fact exists as to whether the "obscure" articles in foreign newspapers constitute corrective disclosures. (Pl.'s Opp'n at 6.) Plaintiff contends that: (1) the Court should not decide loss causation on a motion to dismiss; (2) Defendant's loss causation argument actually is a "truth on the market" affirmative defense, and (3) the foreign sources underlying the Aurelius Article do not foreclose the Court from finding a corrective disclosure. (*Id.*)

Here, the Aurelius Article describes Pingtan's purchase of ships from Hong Long by directly citing Pingtan's SEC filings. To support assertions concerning ownership of Pingtan's ships, the Aurelius Article published a chart directly from Pingtan's 2015 10-K. (Aurelius Article 18; 2015 10-K at F-24.) The Aurelius Article's conclusion that Pingtan's Indonesian fishing

licenses never existed also is based on public information, including an August 27, 2015 Indonesian news article, which the Aurelius Article reproduced. (Aurelius Article at 8-9.) Lastly, the Aurelius Article's conclusion that the "Timorese fishing licenses were awarded to Honglong, not Pingtan" originally was published in a Chinese Embassy news release from November 2016 and a *Sydney Morning Herald* article from February 2017. (Aurelius Article at 17; Daniel Flitton, "Economy of Scales: Depleted stocks force Asian fisherman into Australian waters," *Sydney Morning Herald* (Feb. 25, 2017), Defs.' Ex. J.; Docket Entry No. 34-10; Am. Compl. ¶¶ 58, 60.)

In *Omnicom*, the plaintiff asserted that information contained in an article published in *The Wall Street Journal* constituted a partial corrective disclosure of fraud. 597 F.3d at 511. The district court held that plaintiff "proffered no evidence sufficient to support a finding of loss causation." *Id.* at 503. The Second Circuit affirmed, reasoning that "[b]ecause appellant failed to demonstrate any new information in [*The Wall Street Journal*] article regarding Omnicom's alleged fraud, [the plaintiff had] failed to show a price decline due to a corrective disclosure." *See*, *Omnicom*, 597 F.3d at 513.

Plaintiff contends that *Omnicom* is inapplicable because that case was disposed of on summary judgment and not a motion to dismiss. However, the Second Circuit has applied *Omnicom* to cases at the motion to dismiss stage. *See*, *e.g.*, *Central States, Southeast & Southwest Areas Pension Fund*, 543 F. App'x 72, 74 (2d Cir. 2013). Additionally, district courts in the Second Circuit have applied *Omnicom* at the motion to dismiss stage. *See*, *e.g.*, *In re China Organic Sec. Litig.*, 2013 WL 5434637, at *7-9 (S.D.N.Y. Sept. 30, 2013); *In re CRM Holdings, Ltd. Sec. Litig.*, 2013 WL 787970, at *6 (S.D.N.Y. Mar. 4, 2013); *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012). Moreover, Plaintiff does not cite case law to support her contention that the sources of the Aurelius Article are "obscure" foreign sources, and

16

therefore, not publicly available information, lacks legal support.  Plaintiff also ignores the realities of the accessibility of the internet.

Accordingly, based on this record, the Court finds the Aurelius Article did not reveal any undisclosed information.  Rather, the Aurelius Article relied on public information and merely represented the author's opinion that Pingtan's "shares are likely worthless" and that "shareholders are likely to be left with total losses."  (Aurelius Art. at 3.)  *See*, *Janbay*, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) ("[R]aising . . . questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud" for purposes of loss causation.").

The Court's finding is also supported by a similar recent case against Defendants in *Fila v. Pingtan Marine Enterprises Ltd.*, 195 F. Supp.3d 489 (S.D.N.Y. 2016).   In *Fila*, the plaintiff alleged loss caused by an alleged corrective disclosure in an online article written by an amateur stock analyst.[5]  Just like the Aurelius Article, the article in *Fila* was based on public information and included the author's negative opinion based on that information.  *Fila*, 195 F. Supp. at 496-97.  The *Fila* Court dismissed the complaint on the grounds that the plaintiff failed to plead loss causation because "to establish loss causation, a corrective disclosure must 'reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint,'" and the article at issue was "based solely on public information."  *Id.* at 497 (citing *Omnicom*, 597 F.3d at 512).  Relying on *Omnicom*, the *Fila* Court held that the article merely was "'[a] negative journalistic characterization of previously disclosed facts,'" which "'does not constitute a corrective disclosure of anything but the journalists' opinions.'"  *Id.* (citing *Omnicom*, 597 F.3d at 512).

---

[5]     The Court notes that the plaintiff's counsel in *Fila* also is Plaintiff's counsel in this case.

Here, as in *Fila*, the amended complaint does not plausibly state that the alleged misstatements and omissions regarding fishing licenses in Indonesia and Timor-Leste "conceal something from the market that, when disclosed, negatively affected the value of the security." *Central States, Southeast & Southwest Areas pension Fund*, 543 F. App'x at 74.

Accordingly, Plaintiff fails to plead loss causation sufficiently.

**B.      Plaintiff Fails to Plead Adequately a Material Misrepresentation or Omission**

**1.      *The Indonesian Fishing Licenses***

Plaintiff contends that Pingtan's SEC filings falsely state that "a majority of Pingtan's fishing vessels are licensed by the Indonesian government to fish in Indonesian waters" when "[i]n actuality, Pingtan never had any licenses to fish in Indonesian waters."  (Am. Compl. ¶¶ 5-6.) Plaintiff also asserts that Pingtan's statements were "false and misleading because . . . Pingtan's vessels were never licensed to fish in Indonesian waters."  (Am. Compl. ¶ 47.)  Plaintiff further argues that "in analyzing potential return on investment, the market does not look solely at a company's current operations, but also (if not more importantly) at a company's future prospects." (Pl.'s Opp'n at 9.)  Defendants counter that Plaintiff's allegations that Pingtan misstated or omitted facts regarding whether it had licenses to fish in Indonesia are belied by Pingtan's SEC filings and press releases.

Here, Pingtan's public filings disclosed that Pingtan obtained Indonesian fishing licenses through third parties, specifically, PT. Avona Mina Lestari and PT. Dwikarya Reksa Abadi.  (2015 10-K at F-22; 2016 10-K at F-22; *See also*, Q2 10-Q at 19.)  Moreover, Pingtan's public filings, as set forth above, clearly disclosed that Pingtan stopped fishing in Indonesia in February 2015. This fact flatly contradicts Plaintiff's allegations.  Moreover, whether Pingtan was licensed to fish in Indonesia could not have been a material misrepresentation or omission to a reasonable investor

during the putative class period when considering the all the available information in Pingtan's public filings.

Plaintiff appears to rely on Pingtan's statements in its 2016 10-K that "[t]he growth of [Pingtan's] business depends on [its] ability to secure fishing licenses directly or through third parties" to argue that Pingtan materially misrepresented its future prospects. However, that statement cannot be viewed in isolation. *Rombach v. Chang*, 355 F.3d 164, 177 n.11 (2d Cir. 2004) ("The test for whether a statement is materially misleading . . . [is] whether representations, viewed as a whole, would have misled a reasonable investor.").

Accordingly, based on this record, Plaintiff fails to plead sufficiently that Defendants statements concerning its fishing operations in Indonesia were materially misleading or materially or contained a material omission.

## 2. *The Timor-Leste Licenses*

Plaintiff contends that Pingtan falsely stated in its 2016 Q2 and Q3 10-Q that "[a]mong [Pingtan's] 135 fishing vessels, 13 vessels have obtained fishing licenses from the Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste and will operate in the sea area of Democratic Republic of Timor-Leste." (Am. Compl. ¶ 50.) Plaintiff further asserts that the alleged statements repeated a similarly false announcement Pingtan made in an August 4, 2016 press release. (*Id.*) According to Plaintiff, Pingtan's statements concerning Timor-Leste were false and misleading because "the Timorese fishing licenses were not issued to Pingtan" but rather to "Hong Long, a different company that is owned and controlled by Defendant Zhuo's wife." (Am. Compl. ¶ 51.)

A plaintiff alleging securities fraud "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach*,

355 F.3d at 174 (emphasis added). "Defendants cannot be alleged to have misrepresented or omitted that which they plainly disclosed." *In re Apple REITs Litig.*, 2013 WL 1386202, at *12 (E.D.N.Y. Apr. 3, 2013), *vacated in part on other grounds*, 563 Fed. Appx. 81 (2d Cir. 2014)

Here, whether licenses were issued to Hong Long rather than Pingtan does not make Pingtan's statements false or misleading because Pingtan disclosed in public filings that Pingtan acquired vessels from Hong Long. Pingtan further disclosed that it has had full ownership of and the full right to operate the vessels since June 2013, even if not all the vessels were officially registered to Pingtan. Moreover, Pingtan's public filings do not state or even imply that the government of Timor-Leste issued licenses directly to Pingtan. Rather, the licenses were obtained by the vessels themselves. Pingtan clearly states that "13 vessels have obtained fishing licenses" from Timor-Leste. (2016 Q2 10-Q at 26; 2016 Q3 10-Q at 27.) Moreover, the August 4, 2016 press release expressly stated that "thirteen fishing vessels controlled by the Company . . . obtained fishing licenses from the Ministry of Agriculture and Fisheries of Democratic Republic of Timor-Leste." (August 4, 2016 Press Release at 1.) Pingtan's August 5, 2016 8-K, to which the press release is attached repeats the identical information. (August 5, 2016 8-K at 2.)

Plaintiff appears to rely on the *Sydney Morning Herald* article for the allegation that "Pingtan assured the Timorese government that it had nothing to do with those vessels." (Am. Compl. ¶ 59.) However, that article states that "[t]he Chinese company running the boats" was Pingtan. (*Sydney Morning Herald* Article at 4.) While perhaps imprecise, this press statement is consistent with Pingtan's public statements. Moreover, like the Indonesian fishing licenses, the fact that the licenses were issued to Hong Long instead of Pingtan would not have significantly altered the total amount of information available from various public sources to a reasonable investor during the putative class period.

Accordingly, based on this record, Plaintiff has failed to allege plausibly that Defendants have made material misrepresentations or omissions concerning its fishing operations in Timor-Leste.

### C.    Plaintiff Fails to Plead Scienter Adequately

Plaintiff alleges that Defendants Zhuo and Yu :(1) "directly participated in the management of" Pingtan; (2) were "directly involved in the day-to-day operation of [Pingtan] at the highest levels"; (3) were "privy to confidential proprietary information concerning [Pingtan] and its business and operations;" (4) were "directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged" in the amended complaint; and (5) were "directly or indirectly involved in the oversight or implementation of [Pingtan's] internal controls." (Am. Compl. ¶ 19) Specifically, as to Defendant Zhuo, Plaintiff further alleges that he is "intimately involved in all aspects of Pingtan's operations." (Am Compl. ¶ 66.)

"Under the core operations theory, 'if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions within the company.'" *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. March 30, 2018). However, "[t]he Second Circuit has . . . questioned whether the core operation doctrine has survived the enactment of the PSLRA[,]" *Id.* at *14 (citing *Frederick v. Mechel OAO*, 475 Fed. Appx. 353, 356 (2d Cir. 2012)), and "the majority rule is to 'consider the core operations allegations to constitute supplementary, but not an independent means to plead scienter.'" *In re Barrick Gold Corp. Sec. Litig.*, 2018 WL 4538896, at *10 (S.D.N.Y. Sep. 20. 2018) (quotation marks omitted).

Here, Plaintiff fails to plead particularized facts suggesting Defendants Zhuo and Yu "actually possessed information contradicting their public statements. *Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016). Thus, "even assuming that the core operations doctrine has continuing vitality as a legal doctrine, it would be far from sufficient, standing alone, to raise a strong inference of scienter in this case." *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *15.

Plaintiff argues that Yu and Zhuo "knowingly misrepresented the Company's license status in Pingtan's SEC filings, in which they declared pursuant to the Sarbanes-Oxley Act that the statements contained therein were accurate." (Pl.'s Opp'n at 15.) However, courts in this circuit regularly hold that the signing of a SOX certification, without more, is insufficient to plead scienter. *See*, *e.g.*, *Das v. Rio Tinto PLC*, 2018 WL 4189512, at *19 (S.D.N.Y. Aug. 31, 2018); *Thomas v. Shiloh Indus., Inc.*, 2017 WL 1102664, at *5; *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015). Indeed, "these certifications typically 'add nothing substantial to the scienter calculus' because 'allowing Sarbanes-Oxley certifications to create an inference in every case . . . would eviscerate the pleading requirements for scienter set forth in the PSLRA.'" *Reilly*, 2018 WL 3559089, at *19.

Plaintiff also contends that "[i]t is highly unlikely that the Company would issue" a statement to the *Sydney Morning Herald*, as alleged in the amended complaint, "without knowledge and approval of its top executives." (Pl.'s Opp'n at 16.) However, "[t]his self-serving speculation falls far short of a plausible pleading, let alone one that satisfies Rule 9(b)'s requirement that fraud be pled with particularity." *See*, *Lopez v. Ctpartners Executive Search, Inc.*, 173 F. Supp. 3d 12, 41 (S.D.N.Y. 2016).

Lastly, Pingtan's representations concerning licenses to fish in Indonesia and Timor-Leste are not so "dramatic" as to infer corporate scienter. *See*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 384 (E.D.N.Y. 2013) ("A strong inference of corporate scienter may also be appropriate 'where a corporate statement is so important and dramatic that it 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'") (internal citations omitted).

Plaintiff has failed to plead scienter adequately. Based on the foregoing analysis, the Court holds that Plaintiff has not stated a claim for a violation of § 10(b) of the Exchange Act, or its implementing rule, Rule 10b–5. Accordingly, Plaintiff's § 10(b) claims are dismissed.

## III.    Plaintiff's Section 20(a) Claims

Plaintiff also brings claims against Defendants Zhuo and Yu for violations of § 20(a) of the Exchange Act in their capacities as controlling persons of Pingtan. However, to state a claim under § 20(a) a plaintiff must adequately allege "a primary violation by the controlled person." *Barclays*, 750 F.3d at 236 (quoting *ATSI*, 493 F.3d at 108). Accordingly, Plaintiff's claims under § 20(a) must also be dismissed because the Court dismissed Plaintiff's § 10(b) claims. *See*, *e.g.*, *Lopez*, 173 F. Supp.3d at 42; *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp.3d 1, 24-25 (S.D.N.Y. Jan. 22, 2016).

## IV.    Leave to Amend

In her opposition, Plaintiff requests leave to amend her claims (Pl.'s Opp'n at 17), but does not attach a proposed amended complaint. Courts must freely grant such leave "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, a "district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Holmes v. Grubman,* 568 F.3d 329, 334 (2d Cir. 2009) (quotation marks omitted). "A proposed

amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Martin v. Dickson,* 100 F. App'x 14, 16 (2d Cir. 2004).

For the reasons discussed above, the Court finds that any amendment would be futile as those claims would not survive a subsequent motion to dismiss. In particular, the Court does not see how Plaintiff's allegations of scienter could be sufficient after a second amended complaint, especially where they are wholly lacking in Plaintiff's current amended complaint. Accordingly, Plaintiff is denied leave to amend.

## CONCLUSION

For the forgoing reasons, Defendants' motion to dismiss is granted and Plaintiff's claims are dismissed with prejudice.

SO ORDERED.

Dated: Brooklyn, New York
     March 31, 2019

_____/ s /_____
DORA L. IRIZARRY
Chief Judge
